Mark E. Merin (State Bar No. 043849)
Paul H. Masuhara (State Bar No. 289805)
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone:     (916) 443-6911
Facsimile:      (916) 447-8336
E-Mail:         mark@markmerin.com
                     paul@markmerin.com

Attorneys for Plaintiffs
ESTATE OF JONATHAN KUKAR-TEKANO,
SHYANNE KUKAR-TEKANO,
SANDRA KUKAR, and DARRYL TEKANO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF CIVIL AND CONSTITUTIONAL RIGHTS**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

38-year-old JONATHAN KUKAR-TEKANO was denied necessary healthcare services and

observation as a pretrial detainee at the South Lake Tahoe Jail in custody of the COUNTY OF EL

DORADO and EL DORADO COUNTY SHERIFF'S OFFICE resulting in his death on March 6, 2025.

## JURISDICTION & VENUE

1.      This Court has jurisdiction over the federal claims under 28 U.S.C. § 1331 (in that they

arise under the United States Constitution) and 28 U.S.C. § 1343(a)(3) (in that the action is brought to address deprivations, under color of state authority, of rights, privileges, and immunities protected by the U.S. Constitution). This Court has jurisdiction of the state claims under 28 U.S.C. § 1367.

2.    Venue is proper in the United State District Court for the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because Defendants are located in the Eastern District of California and because many of the acts and/or omissions described herein occurred in the Eastern District of California.

3.    Intradistrict venue is proper in the Sacramento Division of the Eastern District of California pursuant to Local Rule 120(d) because the claims asserted herein arise from acts and/or omissions which occurred in the County of El Dorado, California.

## EXHAUSTION

4.    On April 4, 2025, the ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE KUKAR-TEKANO, and SANDRA KUKAR submitted a government claim to the COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE relating to the claims asserted in this action.

5.    On May 1, 2025, DARRYL TEKANO submitted a government claim to the COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE relating to the claims asserted in this action.

6.    By June 16, 2025, the COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE failed or refused to act on the claims.

## PARTIES

7.    Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO appears by and through real-party-in-interest Plaintiff SHYANNE KUKAR-TEKANO, the biological child of JONATHAN KUKAR-TEKANO, who brings this action pursuant to California Code of Civil Procedure § 377.30. Plaintiff SHYANNE KUKAR-TEKANO is the successors-in-interest to JONATHAN KUKAR-TEKANO. The declaration regarding Plaintiff SHYANNE KUKAR-TEKANO's status as the successor-in-interest to JONATHAN KUKAR-TEKANO is attached, pursuant to California Code of Civil Procedure § 377.32.

8.    Plaintiff SHYANNE KUKAR-TEKANO is a resident of the County of Spokane, Washington. Plaintiff SHYANNE KUKAR-TEKANO is the biological daughter of JONATHAN

KUKAR-TEKANO. Plaintiff SHYANNE KUKAR-TEKANO brings this action: (1) in a representative capacity as a successor-in-interest, on behalf of JONATHAN KUKAR-TEKANO; and (2) in an individual capacity, on behalf of herself.

9.    Plaintiff SANDRA KUKAR is a resident of the County of Santa Clara, California. Plaintiff SANDRA KUKAR is the biological mother of JONATHAN KUKAR-TEKANO. Plaintiff SANDRA KUKAR brings this action in an individual capacity, on behalf of herself.

10.    Plaintiff DARRYL TEKANO is a resident of the County of Santa Clara, California. Plaintiff DARRYL TEKANO is the biological father of JONATHAN KUKAR-TEKANO. Plaintiff DARRYL TEKANO brings this action in an individual capacity, on behalf of himself.

11.    Defendant COUNTY OF EL DORADO is located in the State of California. Defendant COUNTY OF EL DORADO is a "public entity" pursuant to California Government Code § 811.2.

12.    Defendant EL DORADO COUNTY SHERIFF'S OFFICE located in the County Of El Dorado, California. Defendant EL DORADO COUNTY SHERIFF'S OFFICE is a "public entity" pursuant to California Government Code § 811.2.

13.    Defendant JEFF LEIKAUF is and was, at all times material herein, a law enforcement officer and Sheriff for Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE, acting within the scope of employment and under color of state law. Defendant JEFF LEIKAUF is sued in an individual capacity.

14.    Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. is a California corporation doing business in the State of California, as a contracted provider of healthcare services to Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF's jail facilities.

15.    Defendant WELLPATH LLC is a Delaware corporation doing business in the State of California, as a contracted provider of healthcare services to Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF's jail facilities.

16.    Defendant WELLPATH MANAGEMENT, INC. is a Delaware corporation doing business in the State of California, as a contracted provider of healthcare services to Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF's jail

3

facilities.

17.     Defendant DOE 1 is and was, at all times material herein, the Health Services Administrator for Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. in the South Lake Tahoe Jail, acting within the scope of employment and under color of state law. Defendant DOE 1 is sued in an individual capacity.

18.     Defendant JULES HOGANSON is and was, at all times material herein, employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. in the South Lake Tahoe Jail, acting within the scope of employment and under color of state law. Defendant JULES HOGANSON is sued in an individual capacity.

19.     Defendant KATE MOSHER is and was, at all times material herein, employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. in the South Lake Tahoe Jail, acting within the scope of employment and under color of state law. Defendant KATE MOSHER is sued in an individual capacity.

20.     Defendant STEPHEN PITTELLI is and was, at all times material herein, employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. in the South Lake Tahoe Jail, acting within the scope of employment and under color of state law. Defendant STEPHEN PITTELLI is sued in an individual capacity.

21.     Defendants DOE 2 to 20 are and/or were agents, contractors, or employees of Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and/or WELLPATH MANAGEMENT, INC., acting within the scope of agency or employment and under color of state law. Defendants DOE 2 to 20 are sued by their fictitious names and their true and correct names and identities will be substituted when ascertained.

## GENERAL ALLEGATIONS

22.     At all times relevant herein, all wrongful acts described were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

4

**South Lake Tahoe Jail**

23.     Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF operate, supervise, and manage jail facilities within the County of El Dorado, including the South Lake Tahoe Jail located in South Lake Tahoe, California.

24.     Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF are answerable for the safety and security of inmates, detainees, and prisoners in jail facilities, pursuant to California law and Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF's policies and procedures.

25.     Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF are responsible for the actions and/or inactions and the policies and customs of their employees and agents, including responsibilities for ensuring the provision of emergency and basic healthcare services to all inmates, detainees, and prisoners at the South Lake Tahoe Jail.

26.     Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF have authority to make contracts, to provide for jails and corrections, and to operate, supervise, and manage health facilities including at jail facilities through contracts, joint ventures, or partnerships.

27.     At all times relevant herein, Defendant COUNTY OF EL DORADO entered into a contract with Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and/or WELLPATH MANAGEMENT, INC. to provide through employees, agents, and contractors healthcare services to inmates, detainees, and prisoners in Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF's jail facilities including the South Lake Tahoe Jail.

28.     Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. provide a governmental function and stand in the same capacity as Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF when carrying out duties and providing healthcare services to inmates, detainees, and prisoners in jail facilities including the South Lake Tahoe Jail.

29.     Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE,

5

and JEFF LEIKAUF, jointly with Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC., are responsible for developing policies and procedures relating to healthcare services provided to inmates, detainees, and prisoners in jail facilities including the South Lake Tahoe Jail, from the time that inmates, detainees, and prisoners are booked until they are released from custody.

30. Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF are responsible for overseeing that Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC.'s personnel comply with contractual duties and responsibilities to provide healthcare services to inmates, detainees, and prisoners in jail facilities including the South Lake Tahoe Jail.

**California Forensic Medical Group, Inc. / Wellpath LLC**

31. On information and belief, Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. were, at all times relevant herein, alter-egos of each other, including sharing money, resources, policies, practices, officers, directors, attorneys, and management, while doing business in California.

32. On information and belief, Defendant WELLPATH LLC controlled aspects of Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC.'s business, including providing policies and procedures for use in jail facilities, human resources, hiring and supervising employees, payroll, accounting, accounts receivable, accounts payable, tax reporting, finance, liability insurance, contract negotiation and setting staffing plans, legal services, and supplies. In return, Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. transferred millions of dollars yearly in revenues to Defendant WELLPATH LLC and other entities.

33. On information and belief, Defendant WELLPATH MANAGEMENT, INC. also controlled aspects of Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC.'s business, including policies and procedures for use at jail facilities.

34. Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. provided contracted medical, mental health, and nursing care inmates, detainees, and prisoners at Defendants COUNTY OF EL DORADO, EL DORADO COUNTY

6

1    SHERIFF'S OFFICE, and JEFF LEIKAUF's jail facilities, including the South Lake Tahoe Jail.

2        35.    Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. has also been known as

3    "Correctional Medical Group Companies, Inc." since 2013. H.I.G. Capital, LLC acquired Defendant

4    CALIFORNIA FORENSIC MEDICAL GROUP, INC. and rebranded its name under the umbrella of

5    Correctional Medical Group Companies, Inc. in 2013.

6        36.    Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. has also been known as

7    Defendants WELLPATH LLC and/or WELLPATH MANAGEMENT, INC. since October 1, 2018. On

8    October 1, 2018, H.I.G. Capital, LLC announced acquisition and the joining of forces between

9    Correctional Medical Group Companies, Inc. and Correct Care Solutions, LLC creating a partnership

10   with management and rebranding as "Wellpath."

11       37.    On information and belief, Defendants CALIFORNIA FORENSIC MEDICAL GROUP,

12   INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. are and/or were owned and

13   controlled by H.I.G. Capital, LLC. Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC.,

14   WELLPATH LLC, and WELLPATH MANAGEMENT, INC. act on behalf of H.I.G. Capital, LLC and

15   are and/or were responsible for the hiring, retaining, training, and supervising of the conduct, policies and

16   practices of its employees and agents of Defendants CALIFORNIA FORENSIC MEDICAL GROUP,

17   INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC.

18       38.    Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC,

19   and WELLPATH MANAGEMENT, INC. are corporations engaged in the practice of medicine.

20   California law prohibits the corporate practice of medicine, and requires that healing arts practitioners

21   have control over decisions regarding, *inter alia*, inventory, supplies, design specifications for offices,

22   financial aspects of the practice, choice of laboratory, and treatment decisions. On information and belief,

23   decisions required to be made by healing arts practitioners are controlled and made by corporate

24   interests, Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and

25   WELLPATH MANAGEMENT, INC.'s decisions focus on the profitability of its business enterprise

26   rather than the quality of healthcare/medical services provided to inmates.

27                                **Jonathan Kukar-Tekano**

28       39.    JONATHAN KUKAR-TEKANO was a 38-year-old man prior to his death on March 6,

                                          7

2025.

40.     JONATHAN KUKAR-TEKANO suffered from documented disabilities including schizophrenia, depression, anxiety, post-traumatic stress disorder (PTSD), substance abuse disorder, and suicidal ideation.

41.     JONATHAN KUKAR-TEKANO's disabilities required hospitalization and treatment on occasions prior to his death, including involuntary confinement at the California Department of State Hospitals-Atascadero.

42.     JONATHAN KUKAR-TEKANO was prescribed medications for his disabilities, including mood stabilizers.

43.     JONATHAN KUKAR-TEKANO's disabilities resulted in an extensive record of his mental health history including by the Barton Memorial Hospital, California Department of State Hospitals-Atascadero, and California Forensic Medical Group, Inc. dba Wellpath LLC.

44.      JONATHAN KUKAR-TEKANO's disabilities substantially limited one or more major life activities, including caring for oneself, concentrating, thinking, and working.

45.     JONATHAN KUKAR-TEKANO's disability and associated symptoms were exacerbated when he became stressed, discontinued taking medications, and/or abused substances.

46.     JONATHAN KUKAR-TEKANO was suffering from the effects of mental health issues during incarceration and immediately prior to his death.

**Arrest & Booking**

47.     On August 23, 2024, around 11:32 a.m., JONATHAN KUKAR-TEKANO was arrested by the South Lake Tahoe Police Department for alleged violations of: (1) California Penal Code § 273.5(a) (inflicting corporal injury); (2) California Penal Code § 243(d) (battery with injury); (3) California Health & Safety Code § 11364(a) (possession of unlawful paraphernalia); and (4) California Health & Safety Code § 11377(a) (possession of controlled substance).

48.     Around 12:07 p.m., JONATHAN KUKAR-TEKANO was booked as a pre-trial detainee into the South Lake Tahoe Jail, 1051 Al Tahoe Boulevard, South Lake Tahoe, CA 96150.

49.     Around 4:27 p.m., Laura Martinez, a medical staff member employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH

8

MANAGEMENT, INC., reported conducting a "Receiving Screening" on JONATHAN KUKAR-TEKANO, including: "Have you attempted suicide in the past? Yes"; "How: Cut/Stabbing"; "When: 1-5 years"; "Drugs[:] Yes"; "Type: Methamphetamines"; "Route: Inhaled"; "Amount: 1 GM"; "Last Used: 08/23/2024"; "Frequency: 1-5 days a week"; "Duration: Greater than 1 year"; "Current or past mental health diagnosis? . . . . Yes (Describe/list): (PTSD, SCHIZOPHRENIA, ANXIETY)"; "Placement / Housing Recommendation: . . . . Other: (UP TO CUSTODY)"; "Does patient need a referral? No."

50.    Around 4:27 p.m., Laura Martinez "Created" two different "Alerts" in JONATHAN KUKAR-TEKANO's medical file: "Suicide History" and "Mental Health Patient."

51.    On September 3, 2025, around 8:23 p.m., Defendant JULES HOGANSON, a licensed vocational nurse (LVN) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported an "Initial Health History (IMQ)" on JONATHAN KUKAR-TEKANO, including: "Amphetamine: History of withdrawal? . . . . Yes"; "History of Mental Health Disorder? . . . . Yes"; "Have you ever attempted suicide? Yes."

52.    Around 8:23 p.m. p.m., Defendant JULES HOGANSON "Created" an "Alert" in JONATHAN KUKAR-TEKANO's medical file: "Withdrawal History."

53.    On August 27, 2024, around 1:50 p.m., Defendant KATE MOSHER, a licensed clinical social worker (LCSW) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported conducting a "Columbia Suicide Severity Rating Scale" on JONATHAN KUKAR-TEKANO, including: "Have you wished you were dead or wished you could go to sleep and not wake up? Yes"; "Have you ever done anything, started to do anything, or prepared to do anything to end your life? . . . . Yes (Pt states years ago he did try to harm self. W[i]ll cont to assess.)'"; "If YES, ask: How long ago did you do any of these? Over a year ago."

54.    Around 6:10 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Pt states he has been feeling frustrated to be on AdSep and not getting out of cell 'I need to take a shower' and states that 'sometimes' he feels depressed and has a hx of SI but none currently. When asked if he had any thoughts to harm self he denied and he expressed interest in engaging with psychiatry on Thursday as well as willing to f/u with MHIA with MHP later this week. Seen cellside along with Officer Grover around 1300."; "Objective … :

9

See form. Pt appeared uncomfortable, anxious."; "Assessment … : No lethality or risk issue noted. Continue to assess. Pt reports some depression currently, hx SI with none currently."; "Plan … : Referred to psychiatry. F/u MHIA. . . . Let Classification officer know that pt has hx depression and does not like being on AdSep."

55.     On September 10, 2024, around 8:57 p.m., Defendant KATE MOSHER reported conducting a "Mental Health Initial Evaluation" on JONATHAN KUKAR-TEKANO, including: "Hospitalized for psychiatric treatment? Yes, (If yes, how many times?) (He reports he has hx psych hospitalization extensively and that he did trauma related tx and EMDR)"; "Reason: trauma per pt"; "List previous medications taken: Did not specify, but has taken meds in past"; "History of or current hallucinations? States 'not right now' and states he does not want to share very much about his sx rig[]ht now"; "Educational History: Pt did not answer all questions, he was very anxious and most of intake focused on sx and coping"; "History of victimization? Yes"; "If yes, as an adult or as a child? Pt states he has experienced trauma as child"; "Current/History of violent behavior? Yes (describe): (DV chg)"; "Current or Prior SSI/SSDI? . . . . He did not clarify, but has mentioned some hx of SI in past"; "Drug use? Yes"; "If yes, type? Meth"; "If Other: Frequency, Duration of Use, Last Use Date: just prior to jail, 14 days"; "History of substance use treatment or detoxification? was part of inpatient program"; "If available, willing to participate in a substance use program? Yes"; "Select all Risk Factors that apply: Gender (male)"; "Psychiatric hospitalization (recently released)"; "Trauma / abuse experienced"; "Violence / domestic abuse towards others"; "Select all Protective Factors that apply: Future goals/plans are defined"; "Insight into problems/issues"; "Mental health treatment engagement"; "Social support (spouse/family)"; "Estimated current self-harm/suicide risk level: Low"; "Mood: Anxious"; "Affect: Other (specify): (restriction)"; "Clinical Impressions[:] Pt has been suffering with anxiety as well as recently sober from meth, he discussed having an array of useful coping tools and feels he is able to adjust to jail without any MH crisis or emergency"; "MH will follow up within … (1 wk)"; "Housing Recommendation: General Population"; "Refer to: pt refused psych."

56.     Around 8:57 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : 'Re-attempt MHIA' Pt struggling with a lot of anxiety. He states he was in state hospital for a long time and had a lot of past trauma he got tx for,

10

and that when he got out of jail last time he relapsed with meth, now 14 days sober. . . . See assmt. Pt met with writer and MSW intern in attny booth around 1300."; "Objective … : Pt was tense and shaky at first but as meeting went on his range of affect improved and he appeared to relax. No SI/SIB/HI. See form."; "Assessment … : Hx methamphetamine use. Pt reports he has a hx of personal trauma and loss. No evidence of immediate risk issue. Charges: 1 count of 273.5(A) PC- Inflict corporal injury on spouse/cohabitant/datng relatnshp - Simple (F) [Felony] Bail: $0 1 count of 243(D) PC- Battery w/serious bodily injury (F) [Felony] Bail: $0 1 count of 11364(A) HS- Possess unlawful paraphernalia (M) [Misdemeanor] Bail: $0 1 count of 11377(A) HS- Possess controlled substance (M) [Misdemeanor] Bail: $0"; "Plan … : Pt states he wants to manage his sx with his coping tools and not with meds, but that if he feels worse or if it is urgent he will let staff know right away."

57.    On September 16, 2024, around 5:26 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Referral 'One wk fu per pt request'. Pt was seen in attrny booth around 1pm at SLT Jail. Pt stated, 'I am doing alright, I just feel a lot of pressure'. Pt stated 'Some people lost it' when referring to court being canceled. Pt stated 'I have a court date on the 30th'. Pt reports being structured in his cell helps him in regards to his mood. Pt reports he hears women screams and wonders if it is real."; "Objective … : Pt was engaged, tense. No SI/SIB/HI."; "Assessment …: R/o A/h, Anxiety."; "Plan … : MHP f/u one month."

58.    On September 23, 2024, Plaintiff SANDRA KUKAR, JONATHAN KUKAR-TEKANO's mother, contacted the South Lake Tahoe and reported that she received a message from JONATHAN KUKAR-TEKANO which "alarm[ed]" her and caused concern for his mental health.

59.    Around 6:18 p.m., Lisa Duggan, a registered nurse (RN) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : custody alarmed by txt mother reported"; "Objective … : remains safe in confinement"; "Assessment … : States had overwhelming thoughts during texting with mother and cannot recall all the things he said to her, so many thought flooding him that he may have said he was going to self[-]harm but can't recall any specific. A[t] this moment does not have self[-]harm[in]g thoughts, is trying to occupy time with drawing and keeping busy. Declared does not have suicidal thoughts and willing to tell

custody if begins to have self[-]harming thoughts. Denies feeling hop[]eless. Custody to follow up with checks and will send him back to unit as long as he feels safe."; "Plan … : MH sick call in am."

60.    On September 24, 2025, around 5:31 p.m., Defendant KATE MOSHER reported a "Mental Health Structured Progress Note" related to JONATHAN KUKAR-TEKANO, including that "Custody asked for pt to meet with MH." Around 5:31 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : 'Had text message that alarm his mother today, states he is not suicidal now and cannot recall all the things he said in his text. Rn staff request SC with MH for safety.' Note that pt came to attny booth in SLT jail around 1245 for MH sick call. Pt reports he is doing 'fine' and he believes his mother was crossing boundaries to contact the jail 'I already met with the Sgt... I am fine and if I am not I will let you know.' Pt only met briefly."; "Objective … : No SI/SIB/HI. Pt polite, engaging. See form."; "Assessment … : See chart. No evidence of imminent risk."; "Plan … : MHP Fu as scheduled."

61.    On October 7, 2024, around 9:18 p.m., reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Two week fu 'I am seeing my ex who passed away' he states he is seeing his ex and he is not sure if he is awake or asleep, she is shaking her head no and he is not sure what this means. He states 'she was murdered out on hwy 17' he states she had been run over 'by three people'. . . . Pt states that he has PTSD and that medications have not helped him in the past, only EMDR has. We discussed how trauma therapy has helped him previously and how he can take tools from his past treatment and use them while in jail."; "Objective … : Pt tense, expressive, anxious at times. No evidence of SI/SIB/HI."; "Assessment … : Anxiety, especially at night. R/o nightmares vs psychosis sx"; "Plan … : Refer pt to psychiatrist based on sx. MHP fu two weeks." Around 9:17 p.m., Defendant KATE MOSHER reported a "Mental Health Structured Progress Note" related to JONATHAN KUKAR-TEKANO, including: "Speech: Pressured"; "Mood: Anxious"; "Refer to: Psychiatry."

62.    On October 10, 2024, at 11:12 a.m., Defendant STEPHEN PITTELLI, a psychiatrist (MD) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Pt has been seeing visions of ex, unsure if it is a nightmare. He

has been at a state hospital before and he says that medication does not work because it is too sedating and then he feels trapped, at the same time he seems unstable so a psychiatry referral was suggested to him to address his anxiety, nightmares vs psychosis, and panic attacks. Hx SUD."; "Objective … : pt with some anxiety, depression. reluctant to take pills. no s/i, no a/hs, some decrease in sleep. eventually agreed to low dose buspar."; "Assessment … : depression, anxiety."; "Plan … : buspar 10 bid. fu in 90 days or sooner by req[ue]st."

63.     On October 13, 2024, around 6:11 a.m., Defendant JULES HOGANSON reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, Buspirone (Buspar 10mg tab).

64.     On October 15, 2024, around 5:45 a.m., Estelita Dipon, a registered nurse (RN) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, Buspirone (Buspar 10mg tab).

65.     On October 16, 2024, around 5:28 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

66.     Around 6:13 p.m., Daryl Lauffer, a licensed vocational nurse (LVN) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, Buspirone (Buspar 10mg tab).

67.     On October 18, 2024, around 6:17 p.m., Joshua Fricke, a registered nurse (RN) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, Buspirone (Buspar 10mg tab).

**Poison Ingestion**

68.     On October 19, 2024, custody staff reported that JONATHAN KUKAR-TEKANO was ingesting barbicide, a liquid disinfectant primarily used to kill germs, fungi, and viruses on tools like combs, shears, and brushes.

69.     Around 9:31 p.m., JONATHAN KUKAR-TEKANO was transported from the jail and

13

admitted into Barton Memorial Hospital, 2170 South Avenue, South Lake Tahoe, CA 96150.

70.    Around 9:41 p.m., a hospital nurse reported: "Pt sent from jail for consuming barb[i]cide. Pt admits to using small amounts for approx 1.5 weeks to make the 'voices quieter' pt denies as attempt to harm himself. Pt states he consumed more th[a]n usual today, induced vomiting after consumption."

71.    Around 9:58 p.m., Defendant JULES HOGANSON reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective …: Barbicide ingestion."; "Objective … : Met I/M in holding cell brought by deputies at 2103 hours, stating that he had ingested '3-4 shots of Barbicide'. Pt appeared very agitated-yelling. He stated he drank the poison to '...drown out all of the voices in his head that won't stop'. Denied that this incident was a suicide attempt. VSS, with the exemption of elevated DBP. He denies any abdominal pain, but states that he has been vomiting. I/M states that color of his vomit is yellow to clear. States that his eyes are '...burning out of my head'. Eyes watering profusely. Pupils ~6mm PERRLA. No neuro deficits noted at this time. Able to ambulate. Able to follow commands."; "Assessment [blank]"; "Plan … : Paramedics arrived and report given to them @ ~2115 hours. EMS called Poison Control. Pt was taken by ambulance Code 3 to Barton Memorial Hospital ED. Report given to ED RN/CN Heidi @ ~2120 hours. Duty Sgt Luna aware. HCA contacted @ ~2130 hours."

72.    Around 10:25 p.m., an emergency room nurse reported: "Pt reports he also consumed a small amount of decanoic acid 1.65%..."

73.    On October 20, 2024, around 1:39 a.m., JONATHAN KUKAR-TEKANO was discharged from the Barton Memorial Hospital and transported back to the South Lake Tahoe Jail.

74.    Around 2:17 a.m., an emergency room doctor reported: "Jonathan Kukartekano is a 37 y[/]o. male who presents to the Emergency Department for evaluation of drug ingestion. Patient is currently in custody of El Dorado County Sheriff's office. He has been in custody since August. He has a history of PTSD for which he has previously been treated with psychiatric inpatient services. He currently does not take any medications. He does have a history of drug use. He denies any recent drug use. He reports that when laying in his cell, he feels like his brain is 'spinning' and he is unable to find periods of calm/rest. He reports that he usually tries to draw pictures which helps calm his thoughts. He denies any SI/HI. Tonight he attempted to 'clean his brain' by consuming some cleaner from the jail. He

14

was sent in for medical evaluation. He does report that he was having some vision changes and some cramping in his hands after drinking the cleaner. He does report that he vomited a few times. . . . Patient has a history of PTSD and reportedly was having racing thoughts so he ingested some cleaner that was available to him while he is incarcerated. Poison Control Center was contacted on presentation. They recommended initial blood work which was unremarkable. Repeat blood work was also unremarkable. Patient did also disclose that he consumed some deck and Noack acid. This was also discussed with Poison Control Center, no acute changes. His initial lactic acid was mildly elevated, he was tolerating p.o. fluids and on repeat lactic acid reassuringly normal. He was monitored in department on telemetry during which she had no cardiac arrhythmias/dysrhythmias. He was medically cleared for discharge back to jail. He is asked to follow-up with El Dorado County mental health given his racing thoughts."

75.     Around 2:43 a.m., Defendant JULES HOGANSON reported a "Medical Treatment Order for Patient Housing" related to JONATHAN KUKAR-TEKANO, including: "Condition/Disability: Other (specify): (Safety Cell for psychiatric reasons.)"; "Treatment/Accommodation/Housing Order: Other: (specify): (Safety Cell for psychiatric reasons.)"; "Reason for above: Ingestion of poison 'to drown out the voices in my head'."; "Who was notified on the Correctional Staff? SGT on duty – Luna." Around 2:49 a.m., Defendant JULES HOGANSON reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Objective … : Pt cooperative. Denies any more attempts to cause harm to himself. Denies SI or SA. VSS stable. Denies any abd. pain. Pt denies n/v/d. C/o "throbbing" HA 7/10. On-Call provider called APAP orders for H/A pain rec[ei]ved. Administered APAP @ ~0238 hours. No s/s of acute di[s]tress noted at this time. Will continue to monitor."

76.     Around 7:20 a.m., Defendant JULES HOGANSON reported a "Mental Health Observation/Step Down" related to JONATHAN KUKAR-TEKANO, including: "Reason for Mental Health observation: Step down from Suicide Watch"; "Contact type: Placement (from a non- suicide watch)"; "Description of circumstances/event leading to watch: Pt drank 4-5 shots of Barbicide on 10/19/2024 to 'drown out the voices in my head that won't stop.'. I/M stated to nurse that he did not try to commit suicide."; "Mood: Anxious"; "Affect: Flat"; "Thought Form: Flight of Ideas"; "Insight: Poor"; "Judgment: Poor"; "Behavior Impulsive"; "RISK FACTORS[:] Active major depression/mania/hallucinations/delusions"; "Clinical plan that specifically addresses the patient's

15

presenting problem for which they are being seen: Patient needs to be evaluated by Mental Health (LCSW)/Psychiatry d/t 'hearing voices'."

77.    Around 5:49 p.m., Janry Arenas, a licensed vocational nurse (LVN) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, Buspirone (Buspar 10mg tab)

78.    On October 21, 2024, around 5:38 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

79.    Around 9:28 a.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Referral: Pt drank3-4 shots of Barbicide to 'Drown out the voices' Nurse reports that pt claimed he was not suicidal but was trying to do something to decrease hallucination of his girlfriend that has passed away in the past. He went to the hospital and then was placed in the safety cell. . . . Pt recently started Buspar on the 10th, has taken most doses per MAR. . . . Pt interviewed cellside around 1015 along with Sgt Amoruso. Pt reports 'I was not trying to kill myself... you ever just want to take your brain out and clean out all of the junk all of the little cracks?' pt described that he has been drinking 'a little each day' last week of Barb[icide] to try to clean his brain. Pt states he does not want to take any psych meds, and that the Buspar has not helped much."; "Objective … : Pt alert, communicative, states he is not hearing A/h now but has lately when confined in safety cell. Denies SI, no SIB since in safety cell, no HI. No evidence of responding to IS currently."; "Assessment … : Pt has been drinking 'barb[i]cide' cleaner for shaver from pod. . . . Depression and anxiety. . . . Pt cooperative and can be moved to Observation cell. Pt does not appear to have been suicidal, he has been delusional that cleaner ingestion will clean his brain. . . . Pt has been to state hospital in past. Pt reports hx SUD and trauma."; "Plan … : Consultation with Sgt and LVN, team decision to downgrade watch. Provide MTO to Sgt Amoruso to move pt to Observation. MHP f/u tomorrow to re-evaluate pt needs."

80.    Around 10:29 a.m., Defendant KATE MOSHER reported a "Medical Treatment Order for Patient Housing" related to JONATHAN KUKAR-TEKANO, including: "Condition/Disability: Other (specify): (Patient was recently drinking Bab[i]cide all week to 'clean his brain' and had to be sent to get

16

medical attention.)"; "Treatment/Accommodation/Housing Order: Other: (specify): (Patient can move to Observation cell with q 30 min checks, regular jail clothes, regular bedding, mattress, regular food tray, book to read.)"; "Who was notified on the Correctional Staff? Sgt Amoruso."

81.     Around 12:06 p.m., Defendant KATE MOSHER reported conducting a "Suicide Watch Initial Evaluation for Mental Health" on JONATHAN KUKAR-TEKANO, including: "Reason for Watch Self-injurious Behavior (He was drinking 'barb[i]cide' cleaner for shaver to 'clean out his brain')"; "Appearance: Disheveled (in a safety garment )"; "Mood: Other: (Specify) (mildly upset)"; "Thought Content: Delusional (thinks that Barb[icide] will help with his thoughts and clean his brain)"; "Insight: Poor"; "Judgment: Poor"; "Medication Adherent? Partially"; "Current Medications: Buspar"; "Approximate Date of Last Self-Harm Incident: This weekend was drinking a lot of Barb[icide] and felt sick"; "Patient current on Detox/Monitoring Protocol? has been in the jail for a while"; "Have you ever done anything, started to do anything, or prepared to do anything to end your life? . . . . Yes (States in the past he had some SI, but none recently. Denies)"; "If YES, ask: How long ago did you do any of these? Over a year ago"; "Risk Factors[:] Active major depression/mania/hallucinations/delusions (Patient has hx DV. He has intrusive thoughts and hallucinations regarding an ex who passed away that he feels guilt about.)"; "Gender (male)"; "Impulsive"; "Non-adherence to psychotropic medication"; "Non-suicidal self-injury"; "Violence / domestic abuse towards others"; "Protective Factors[:] Future goals/plans are defined (denies SI)"; "Insight into problems/issues"; "Mental health treatment engagement"; "Other (describe): (denies SI)"; "Estimated Current Self-harm/Suicide Risk Level[:] Low"; "Risk Formulation: Pt has some distant reports of SI, but none recently. He drank cleaner r/t thoughts it would clean his brain, delusional, vs attempting to end life. Pt has hx psych hospitalization and SUD, he has been having more intrusive thoughts of ex since he has been in the jail and off drugs. He does not want to take psych medications. He appears that his risk of ingesting cleaners if he has access is moderate however his risk of suicide attempt is low."; "Recommended Placement: Other: (Specify) (Observation cell)."

82.     Around 1:30 p.m., Jasmine Bubion-Nava, a licensed clinical social worker (LCSW) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported conducting a "Suicide Watch Initial Evaluation for Mental Health" on JONATHAN KUKAR-TEKANO, including: "Changes since last visit/Behaviors of

Concern[:] Pt reports drinking chemical to 'make the noises stop and clean my brain'."; "Appearance: Disheveled"; "Speech: Pressured"; "Mood: Anxious"; "Affect: Blunted"; "Thought Form: Flight of Ideas"; "Thought Content: Hallucination"; "Behavior: Impulsive"; "Have you wished you were dead or wished you could go to sleep and not wake up? . . . . Yes"; "Risk Factors[:] Active major depression/mania/hallucinations/delusions"; "Gender (male)"; "Hopelessness, feelings of guilt/burden/worthlessness flashbacks, severe anxiety, agitation, overwhelmed"; "Impulsive"; "Prior suicide watch placement while incarcerated"; "Prior suicide attempts / suicide note found"; "Psychiatric hospitalization (recently released)"; "Protective Factors: Children at home"; "Estimated Current Self-harm/Suicide Risk Level[:] Intermediate"; "Risk Formulation: Pt had a suicide attempt 24 hours ago, should remain in safety cell for further monitoring."; "Reasons for Living: Pt struggled with identifying RWL, but stated he has 1 daughter."; "Subjective content from patient as well as Clinician objective observations: Pt stated he was in safety cell d/t drinking a chemical called barbicide in order to try and 'make the noises stop and clean my brain'. Pt reported hx of PTSD, anxiety, and schizophrenia. Pt appears to be somewhat consistent with current Psych med. Pt reported substance use of meth and last use was approx 2 months ago. Pt stated he has been 'drinking a little bit each day this week, but drank more yesterday'. Pt reported coping skills of drawing, cleaning, working out, and socializing. Pt struggled with listing reasons for living, but mentioned he has 1 daughter. Pt endorsed active A/VH but denied current SI/SH/SA. Pt will remain on safety watch until assess further by MHP in 24 hours." Around 1:30 p.m., Jasmine Bubion-Nava reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Late: Met with Pt on 10/20 at approx 0810 via Telehealth. Pt stated he was in safety cell d/t drinking a chemical called barbicide in order to try and 'make the noises stop and clean my brain'. Pt reported hx of PTSD, anxiety, and schizophrenia. Pt appears to be somewhat consistent with current Psych med. Pt reported substance use of meth and last use was approx 2 months ago. Pt stated he has been 'drinking a little bit each day this week, but drank more yesterday'. Pt reported coping skills of drawing, cleaning, working out, and socializing. Pt struggled with listing reasons for living, but mentioned he has 1 daughter. Pt endorsed active A/VH but denied current SI/SH/SA. Pt will remain on safety watch until assess further by MHP in 24 hours."; "Objective … : See SW daily f/u note. Pt seen over Telehealth."; "Assessment … : Pt endorses active A/VH. Possible Dx of schizophrenia.";

"Plan … : MHP to f/u in 24 hours for safety cell assessment."

83.    On October 22, 2024, around 5:33 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

84.    Around 11:57 a.m., Defendant KATE MOSHER reported a "Medical Treatment Order for Patient Housing" related to JONATHAN KUKAR-TEKANO, including: "Condition/Disability: Other (specify): (Pt has been having delusions that he should drink soap to clean his brain.)"; "Treatment/Accommodation/Housing Order: Other: (specify): (Observation cell: q 30 min checks mattress, regular bedding, regular clothing, regular food tray, book, paper and pencils)"; "Who was notified on the Correctional Staff? Sergeant George."

85.    Around 1:41 p.m., Defendant KATE MOSHER reported conducting a "Suicide Watch Daily Follow-Up and Discharge for Mental Health" on JONATHAN KUKAR-TEKANO, including: "Reason for Watch[:] Self-injurious Behavior (eating cleaning products)"; "Appearance: Disheveled"; "Mood: Irritable"; "Affect: Blunted (mildly ar[gu]mentative)"; "Thought Content: Delusional"; "Insight: Poor"; "Judgement: Poor"; "Behavior: Withdrawn"; "Medication Adherent? No"; "Risk Factors[:] Active major depression/mania/hallucinations/delusions"; "Gender (male)"; "Impulsive"; "Lacks social support"; "Restrictive Housing placement"; "Violence / domestic abuse towards others"; "Protective Factors: Mental health treatment engagement (denies Si)"; "Estimated Current Self-harm/Suicide Risk Level[:] Low"; "Risk Formulation: Pt does not present with a risk to purposefully kill self, but is delusional that cleaning products ingested PO can clean his brain and make him feel better. He refuses to take AP meds." Around 1:41 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Suicide watch Pt seen cellside around 1145 to check on progress and safety. Pt states he feels 'worse up here' because there is less to do. He states that he does not want medication, that he wants to do EMDR, which is not available at the jail. Pt focused on getting out of observations cell 'I realize drinking the Barb[icide] was the wrong thing to do.' Writer consulted with Sgt George who reports pt was drinking also the pink soap in the pod. Pt has thoughts that soap can clean his brain. Team determination to leave pt today in Obs cell due to instability and his c/o feeling worse. Discuss plan with RN Courtney as well."; "Objective … : Pt irritable, somewhat argumentative, interactive, poor insight into the problem, groggy. Denies SI or SIB. See

19

form."; "Assessment … : Pt does not present with active SI but does present with instability in his MH, delusional beliefs that could lead to recurrence of ingesting chemicals. He does not appear to be stable enough to return to his housing safely at this time."; "Plan … : Cont suicide watch in Obs cell. MHP fu tomorrow. Psychiatrist fu Thurs."

86.    Around 8:08 p.m., Defendant KATE MOSHER reported conducting a "Suicide Watch Daily Follow-Up and Discharge for Mental Health" on JONATHAN KUKAR-TEKANO, including: "Reason for Watch Other (specify): (Was eating soap in effort to clean brain)"; "Changes since last visit/Behaviors of Concern[:] Pt has insight into the problem with his bx and agrees to only use soap for cleaning. Pt is cooperative with staff and engages with CSP."; "Mood: Anxious"; "Medication Adherent? No"; "Risk Factors[:] Gender (male)"; "Non-adherence to psychotropic medication"; "Trauma / abuse experienced"; "Violence / domestic abuse towards others"; "Protective Factors: Collaborative Safety Plan (CSP) and reasons for living Identified"; "Insight into problems/issues"; "Mental health treatment engagement"; "Social support (friends)"; "Social support (spouse / family)"; "Estimated Current Self-harm/Suicide Risk Level[:] Low"; "Risk Formulation: Pt was drinking soap related to delusional thinking. He overall engages well with staff and reports a plan of coping, expressed that he will talk with psychiatrist tomorrow though he doubts he will want to take any other meds. He is interested in meeting with therapists whenever available."; "Personal Warning Signs: Thoughts to drink soap Feeling panicked."

87.    On October 23, 2024, around 5:22 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

88.    Around 7:23 p.m., Defendant KATE MOSHER reported a "Medical Treatment Order for Patient Housing" related to JONATHAN KUKAR-TEKANO, including: "Condition/Disability: Other (specify): (Patient had drank soap and barb[i]cide over the weekend.)"; "Treatment/Accommodation/Housing Order: Other: (specify): (Pt can go back to regular housing, released from watch.)"; "Who was notified on the Correctional Staff? Sgt Sapien." Around 7:23 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Suicide watch Meet with pt cellside at 1900. Pt states 'I am not going to hurt myself...:' and 'I will only use the soap for cleaning'. . . . See suicide assmt. Pt states he wants to go back

1   to his cell because the banging sounds of the doors is worse in the front of the jail and he has more

2   activities to distract him and help him with anxiety in his pod. He was observed making a call to parent

3   and to a friend earlier, and he was given tablet to use in Observation cell by Sgt today. Consultation with

4   Sgt Sapien team determination to allow pt to go back to pod. Sgt states that soaps are non[-]toxic if pt

5   does try to eat them again."; "Objective … : Pt engaging, anxious at times, participated well in discussing

6   coping plan, no evidence of SIB denies SI no HI. See form."; "Assessment … : Pt not meeting criteria for

7   a suicide watch, no evidence of suicidal thinking or bx. Pt with recent delusional thinking that soap will

8   clean his brain."; "Plan … : Remove from watch. MHP Fu tomorrow. Refer to psych."

9       89.    On October 24, 2024, around 8:14 a.m., Defendant STEPHEN PITTELLI reported a

10  SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : High level of

11  anxiety and frequent panic. Nightmares. Patient has been consuming barb[icide] for a week thinking that

12  can help clean his brain out to get rid of hallucinations and troubling thoughts, was sent to ER and

13  cleared. Psychosis/delusions. Has been to state hospital in past. Suicide watch this week."; "Objective …

14  : spoke with pt. at length. appears to have psychotic symptoms. refuses any medication other than buspar.

15  would not even take atarax. troubling that he was eating barbicide soap to 'clear my mind.' states he will

16  not repeat."; "Assessment … : r/o schizophrenia."; "Plan … : cont. buspar. no other meds per pt. refusal.

17  if he cont. to do acts like ingesting soap, will consider involuntary. f/u in 90 days or sooner by request."

18      90.    Around 11:12 a.m., Defendant STEPHEN PITTELLI reported conducting a "Psychiatrist

19  Sick Call" with JONATHAN KUKAR-TEKANO, including: "Pt has been seeing visions of ex, unsure if

20  it is a nightmare. He has been at a state hospital before and he says that medication does not work

21  because it is too sedating and then he feels trapped, at the same time he seems unstable so a psychiatry

22  referral was suggested to him to address his anxiety, nightmares vs psychosis, and panic attacks. Hx

23  SUD."; "High level of anxiety and frequent panic. Nightmares. Patient has been consuming barb[icide]

24  for a week thinking that can help clean his brain out to get rid of hallucinations and troubling thoughts,

25  was sent to ER and cleared. Psychosis/delusions. Has been to state hospital in past. Suicide watch this

26  week."

27      91.    Around 12:35 p.m., Defendant KATE MOSHER reported conducting a "Mental Health

28  Initial Special Needs Evaluation" on JONATHAN KUKAR-TEKANO, including: "What is the patient's

Special Mental Health Need? Diagnosed with severe mental illness (including Schizophrenia, Schizoaffective Disorder, Bipolar Disorder, moderate to severe Major Depression, and Post Traumatic stress Disorder)"; "What is the patient's Special Mental Health Need? Notable difficulty adjusting to the correctional environment, even though not diagnosed with a serious mental illness (frequent readmits to suicide watch, frequent kites, frequent grievances, etc.)"; "What is the patient's baseline mental state? Pt has ongoing struggle with anxiety, he has hx of incarceration and SUD. He reports trauma hx with memories that trouble him. He has recently been ingesting soap to try to 'clean' his brain and feels his brain is unhealthy, psychosis sx at times with delusions."; "What is the patient's verified treatment history? Pt states he did EMDR at state hospital at some point in the past and that it helped him a lot, however he appears to be fairly symptomatic with panic attacks and nightmares, delusions."; "Current Status/Functioning: Pt improving, cooperative, but reluctant to take psych meds the MD believes wou[ld] help him (APs)."; "Medication Adherent? No"; "Mood: Anxious"; "Affect: Blunted"; "Housing: GP."

92.    Around 12:38 p.m., Defendant KATE MOSHER reported a "Mental Health Treatment Plan for Non-Acute Patients" on JONATHAN KUKAR-TEKANO, including: "Diagnosis: R/o Schizophrenia per psychiatrist"; "Problems: Distressing perceptual disturbances (AH/VH/OH/TH)"; "Difficulty with attention/concentration"; "Medication non-adherence"; "Delusional thought content (paranoia, grandiose, persecutory)"; "Other (specify): (drinking soap)." Around 12:39 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : SW Fu 1 Pt seen cellside with Officer Fox around 1100 at SLT jail. . . . Pt discussed having met with the psychiatrist this morning, that he has agreed that if 'I get worse I will try Zyprexa, a low dose.' Pt was pleased that writer was sending him a activity packet incl some drawing materials. 'Thank you I really appreciate it.' No known current recurrence of ingesting soap so far."; "Objective … : No SI, no SIB, no evidence of ingesting chemicals, tense, cooperative, talkative. See form."; "Assessment … : See chart. Psychiatrist considering Schizophrenia dx. No current evidence of risk issue."; "Plan … : Cont MHP next sick call for fu #2."

93.    Around 11:12 p.m., Defendant JULES HOGANSON reported requesting JONATHAN KUKAR-TEKANO's medical records from the California Department of State Hospitals-Atascadero State Hospital, including "health records relating to his psychiatric Diagnoses as well as mental health

1    treatment records.”

2    94.    On October 25, 2024, around 6:08 a.m., Defendant JULES HOGANSON reported

3    JONATHAN KUKAR-TEKANO “Refused” to take anti-anxiety medication, buspirone (Buspar 10mg

4    tab).

5    95.    On October 26, 2024, around 6:05 a.m., Defendant JULES HOGANSON reported

6    JONATHAN KUKAR-TEKANO “Refused” to take anti-anxiety medication, buspirone (Buspar 10mg

7    tab).

8    96.    On October 27, 2024, around 6:26 a.m., Defendant JULES HOGANSON reported

9    JONATHAN KUKAR-TEKANO “Refused” to take anti-anxiety medication, buspirone (Buspar 10mg

10    tab).

11    97.    On October 31, 2024, around 12:15 p.m., Defendant KATE MOSHER reported a SOAP

12    note regarding JONATHAN KUKAR-TEKANO, including: “Subjective … : Attempt SW Fu 3rd time

13    this week Pt discussed ‘the worst is when I have these glitches’ pt described. Pt talked about having

14    sensations that are unsettling. Pt talked about working out and praying and how that helps ‘I get that

15    warm feeling.’ Pt states he does not yet want to have any other meds, but he will reach out if he changes

16    his mind. Pt states he did meth since 13 yo, but also states that he went through a lot of trauma that he

17    feels impacts his thinking. . . . He reviewed how one of the main things that haunts him, is from when he

18    burned tarot cards, states that there was an entity that was attached to those cards that is now attached to

19    him ‘it is a feeling like when you know you need to get out of a place because you are in danger’. He

20    states he has tried to get an exorcism but that he needs four priests to do it. He feels comforted by prayer,

21    and is hoping to get involved with meeting with Chaplain or any church activities in jail. . . . Pt seen

22    around 1000 am in SLT jail in attny booth.”; “Objective … : Pt alert, engaging, anxious at times, no

23    evidence of SI or SIB. See form.”; “Assessment … : Pt improved, more able to cope. No known

24    ingestion of soaps or chemicals recently. Pt cont to have high level of hypervigilance and anxiety with

25    some sx commonly seen in psychosis. Hx long term meth use. Pt struggles with some guilt from past

26    behaviors.”; “Plan … : Cont SW fu 3 one week.”

27    98.    Around 12:19 p.m., Defendant KATE MOSHER reported a “Mental Health Special Needs

28    Progress Note” relating to JONATHAN KUKAR-TEKANO, including: “Current status and progress

23

since last appointment: Pt coping adequately, no known recurrence of ingesting chemicals or soaps, no evidence of self harm or suicidal thinking."; "Medication Adherent? No"; "Mood: Anxious"; "(Include mental disorders and relevant medical conditions): See psychiatrist notes. Pt with hx anxiety and psychosis sx."

99.     On November 1, 2024, around 6:20 a.m., Defendant JULES HOGANSON reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

100.     On November 2, 2024, around 5:47 a.m., Defendant JULES HOGANSON reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

101.     On November 4, 2024, around 12:10 p.m., Defendant KATE MOSHER reported a "Mental Health Special Needs Progress Note" relating to JONATHAN KUKAR-TEKANO, including: "Current status and progress since last appointment: Pt appears to be stable, no recurrence of ingesting soaps."; "Medication Adherent? No"; "Mood: Anxious"; "Affect: Other (specify): (intense)"; "(Include mental disorders and relevant medical conditions): Pt with anxiety and psychosis sx"; "Continue Special Needs Visits. Follow Up … (1 mo)."

102.     Around 12:11 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : SW fu 3 Pt states he slept around 3 or 4 hours good hours, then the rest of the time is restless. Pt states 'It is a lot of pressure' referring to when he gets anxious, he feels pressure in his head. . . . Pt discussed how he makes jokes about his ingesting soap to others, feeling embarrassed that he did that. Pt was seen in attny booth around 1030 am at SLT jail."; "Objective … : Tense and vigilant at first and calmed over course of meeting, at one point smiling. No SI/SIB/HI. See form."; "Assessment … : Pt improving, coping adequately. No known ingestion of soaps or chemicals reported. Sx anxiety reported. Hx long term meth use."; "Plan … : Pt requesting more colored pencils and coloring pages. . . . MHP fu one month or sooner by request."

103.     On November 6, 2024, around 5:14 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

104.     On November 8, 2024, around 6:27 a.m., Defendant JULES HOGANSON reported

24

JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

105.    On November 14, 2024, around 5:16 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

106.    On November 15, 2024, around 6:22 a.m., Defendant JULES HOGANSON reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

107.    On November 16, 2024, around 6:35 a.m., Defendant JULES HOGANSON reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

108.    On November 17, 2024, around 6:35 p.m., Daryl Lauffer reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

109.    On November 20, 2024, around 5:21 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

110.    On November 21, 2024, around 5:58 p.m., Courtney Johnston, a registered nurse (RN) employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

111.    On November 23, 2024, around 6:00 p.m., Janry Arenas reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

112.    On December 2, 2024, around 11:59 a.m., Aimee Orozco, a medical staff member employed by Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., reported a "Mental Health Special Needs Progress Note" relating to JONATHAN KUKAR-TEKANO, including: "Current status and progress since last appointment: Pt appears to be more anxious, Writer scheduled him to see the psych and provided him with coping tools."; "Medication Adherent? N/A"; "Mood: Anxious"; "Affect: Tearful (Tearful at times)"; "(Include mental disorders and relevant medical conditions): Psychiatrist considering Schizophrenia dx."

113.    Around 12:05 p.m., Aimee Orozco reported a SOAP note regarding JONATHAN

25

KUKAR-TEKANO, including: "Subjective … : Referral "One month fu". Pt was seen in at[t]rny booth in SLT Jail around 10:50am. . . . Pt discussed the death of another inmate stating 'Someone just died and I keep seeing their face'. Pt reports he is going through alot because of the death of another inmate, and his grandfather just died on the 26th of November. Pt states 'I just keeping seeing his face and demonic things'. Writer will schedule[] Pt. to see the psych. Pt stated 'I feel a lot better since talking with you, you just can't talk about your feelings with people here'. Writer discussed coping strategies with pt, which included drawing and exercise, writer also discussed grounding techniques and breathing to reduce anxiety. Writer discussed with nursing staff and sergeant Sapien to check in on Pt."; "Objective … : Pt was alert, anxious at times, cooperative, dressed in Jail attire. No SI/HI or SIB. Pt was upset but denying any urgent need."; "Assessment … : See chart. Psychiatrist considering Schizophrenia dx. No current evidence of risk issue."; "Plan … : One Week F/u. Writer will send pt. information about how to cope with grief. Pt. will be referred to psychiatry due to comments about seeing dead people and demons. Praised pt. for engaging with mental health and sharing about his symptoms. Pt. states he will reach out if he feels he needs support urgently."

114.    On December 5, 2024, around 11:52 a.m., Defendant STEPHEN PITTELLI reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Pt reports seeing dead people in pod and demons."; "Objective … : pt. states sees 'shadows' and other things suggestive of soft ps[yc]hotic symptoms, no s/i, no a/h's, sleep fair. no med se's. states PTSD. declines all meds but buspar."; "Assessment … : PTSD by hx."; "Plan … : increase buspar per pt. request. would consider ap, but pt. averse at this time."

115.    Around 12:05 p.m., Defendant STEPHEN PITTELLI reported conducting a "Psychiatrist Sick Call" with JONATHAN KUKAR-TEKANO, including: "Pt reports seeing dead people in pod and demons."

116.    On December 10, 2024, around 12:33 p.m., Defendant KATE MOSHER reported a "Mental Health Special Needs Progress Note" relating to JONATHAN KUKAR-TEKANO, including: "Current status and progress since last appointment: Pt coping well with no current risk issue. Pt has anxiety, nightmares, and some psychosis sx but he declines psychiatris[t]"; "Medication Adherent? No"; "Appearance: Other (specify): (wide eyed, tense)"; "Mood: Anxious"; "Affect: Other (specify):

(intense)"; "Behavior: Agitated"; "(Include mental disorders and relevant medical conditions): R/o PTSD, psychosis"; "Continue Special Needs Visits. Follow Up … (1 mo)."

117.    Around 12:34 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : One week f/u. . . . Pt checking in after feeling upset last week due to a sudden death of another inmate. Today, pt acknowledged how he holds a lot of body tension, and agreed to work on relaxing his body. 'Sometimes I wake up with nightmares.' Pt states he is feeling better since he had a visit with someone. Pt struggles with some psychosis sx and high anxiety but he does not want to take any AP meds he states he fears he will be 'locked in his head' as he had experienced at psych hospital in past. Pt seen in attny booth around 1115 in SLT jail."; "Objective … : Tense, anxious expression with wide eyes, looking around, cooperative, no evidence of SIB/HI/SI."; "Assessment … : Ps[yc]hiatrist has indicated 'PTSD by hx' and 'R/o schizophrenia'. Pt coping ade[qu]ately currently with no imminent risk."; "Plan … : Pics of Buddhas requested for drawing for coping. . . . MHP fu 1 mo or sooner by request."

118.    On January 6, 2025, around 1:49 p.m., Defendant KATE MOSHER reported a "Mental Health Special Needs Progress Note" relating to JONATHAN KUKAR-TEKANO, including: "Current status and progress since last appointment: No change. Pt cont to take Buspar for anxiety but not addressing some of his other sx. Proacti[ve]e about trying to use coping tools for relaxation."; "Medication Adherent? No"; "Appearance: Other (specify): (wide eyes)"; "Mood: Anxious"; "Affect: Blunted"; "Thought Content: Delusional"; "(Include mental disorders and relevant medical conditions): See psychiatrist notes. Hx anxiety and delusions." Around 1:49 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Seen in attny booth around 1 am. . . . 1 mo fu--Pt was scheduled for in person mental health sick call in South Lake Tahoe jail with LCSW in attorney booth to evaluate symptoms and needs. . . . 'I still see shadows' and 'as much as I read the bible I still have that feeling' pt states he has some kind of negative spirits attached to him since he used tarot cards long ago. Pt states he has to rest because he might have a hernia but that he worries without exercising how he will cope with anxiety, however that he had a visit recently that cheered him up."; "Objective … : Alert, wide eyed, tense, fair range of affect, expressive, polite, no SI/SIB/HI."; "Assessment … : Currently stable but with intermittent sx managed with coping tools. . . .

Hx anxiety and delusional thinking. He was eating soap in past to 'clean brain'."; "Plan … : Pt states he will reach out if he wants to go back to psychiatrist if he feels worse, otherwise will fu one month."

119.    On January 8, 2025, around 9:16 p.m., Defendant JULES HOGANSON reported that JONATHAN KUKAR-TEKANO stated, "I would like to talk to Mental Health."

120.    On January 9, 2025, around 9:13 p.m., Defendant KATE MOSHER reported a "Mental Health Special Needs Progress Note" relating to JONATHAN KUKAR-TEKANO, including: "Current status and progress since last appointment: Increase in anxiety since he can't exercise."; "Medication Adherent? No"; "Appearance: Other (specify): (tense)"; "Mood: Anxious"; "Affect: Labile"; "Behavior: Agitated"; "(Include mental disorders and relevant medical conditions): Psychosis, anxiety." Around 9:14 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : 'I would like to talk to Mental Health'. . . . Pt says he decided that he does want to talk to the psychiatrist next sick call. He says that it is hard not being able to exercise right now and it increases his stress. He was seen in attny booth around 1100."; "Objective … : Pt tense, anxious, alert, cooperative, no SIB or SI. No bizarre bx or thinking"; "Assessment … : See chart. Hx delusions and hallucinations, anxiety. Currently complains of anxiety primarily."; "Plan … : Refer to psychiatrist. MHP Fu two weeks."

121.    On January 16, 2025, around 10:54 a.m., Defendant STEPHEN PITTELLI reported conducting a "Psychiatrist Sick Call" with JONATHAN KUKAR-TEKANO, including: "Pt wants to try additional medications feels that he gets stuck on thoughts that ruin the rest of his day, 'I am getting triggered more often'. He has a recent hx in past 6 mos of ingesting soap to 'clear his brain' and has hx of racing thought, trouble sleeping, and 'seeing' deceased partner." Around 10:54 a.m., Defendant STEPHEN PITTELLI reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Pt wants to try additional medications feels that he gets stuck on thoughts that ruin the rest of his day, 'I am getting triggered more often'. He has a recent hx in past 6 mos of ingesting soap to 'clear his brain' and has hx of racing thought, trouble sleeping, and 'seeing' deceased partner."; "Objective … : pt. states continual anxiety and wants increase in buspar.no s/i, no a/h's, no med ses's sleep fair."; "Assessment … : anxiety, r/o psychosis per hx. will readdress ap next eval"; "Plan [blank]."

122.    On January 21, 2025, around 7:58 p.m., Defendant KATE MOSHER reported a SOAP

note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Referral '2 wk' Pt was offered MH sick call in SLT attny booth with LCSW, pt declined to meet. . . . Met with pt cellside 1330 with Officer Hazelet. Pt dismissive, indicated he is 'fine'."; "Objective … : Alert, no SI/SIB, dismissive, irritable. See form."; "Assessment … : Per psychiatrist, 'anxiety, r/o psychosis' . . . . Would not engage with MHS today."; "Plan … : One month fu."

123.    Around 7:59 p.m., Defendant KATE MOSHER "Created" an "Alert" in JONATHAN KUKAR-TEKANO's medical file: "Mental Health-Special Needs."

124.    On February 4, 2025, JONATHAN KUKAR-TEKANO submitted an "Inmate Sick Call Request Slip" reporting: "Problem / Reason for Request: I was told by Sgt Amorouso to ask medical to meet with me about my mental health records."

125.    On February 16, 2025, around 5:51 a.m., Defendant JULES HOGANSON reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

126.    On February 17, 2025, around 5:39 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

127.    Around 7:17 p.m., Defendant KATE MOSHER reported a "Mental Health Special Needs Progress Note" relating to JONATHAN KUKAR-TEKANO, including: "Current status and progress since last appointment: PT tense but coping adequately"; "Medication Adherent? No"; "Mood: Anxious"; "Affect: Other (specify): (intense, restricted)"; "Continue Special Needs Visits. Follow Up … (one mo)"; "Pt has heightened anxiety and wants to discuss with psychiatrist"; "Pt requests flower pictures." Around 7:18 p.m., Defendant KATE MOSHER reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : MHSN . . . . Pt states that the construction next door is bothering him and he also has not been feeling very supported by people outside the jail, 'Sometimes they start at 6 am with this banging..' pt states that he feels anxious. He was seen early afternoon in SLT attny booth."; "Objective … : Tense, wide eyed, no SI or SIB, calmed over course of the session. See form."; "Assessment … : See chart, some hx delusions and anxiety, SUD hx meth. No DTS or DTO, coping adequately."; "Plan … : Refer to psychiatrist. MHP Fu one month."

128.    On February 20, 2025, around 5:59 a.m., Defendant JULES HOGANSON reported

29

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Estate of Kukar-Tekano v. County of El Dorado*, United States District Court, Eastern District of California, Case No. _____

JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

129.    Around 10:41 a.m., Defendant STEPHEN PITTELLI reported conducting a "Psychiatrist Sick Call" with JONATHAN KUKAR-TEKANO. Around 10:41 a.m., Defendant STEPHEN PITTELLI reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : Pt has heightened anxiety and wants to discuss with psychiatrist"; "Objective … : pt. states increased anxiety, soft psychotic signs, hx PTSD. declined ap meds. wants only increase in buspar."; "Assessment … : mood disorder nos, r/o psychosis."; "Plan … : increase buspar to 30 bid, no ap per pt. fu in 90 days or sooner by request."

130.    On February 23, 2025, around 6:26 a.m., Defendant JULES HOGANSON reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

**Asphyxiation**

131.    On February 27, 2025, around 5:37 a.m., Estelita Dipon reported JONATHAN KUKAR-TEKANO "Refused" to take anti-anxiety medication, buspirone (Buspar 10mg tab).

132.    Defendants DOE 2 to 10, custody staff employed by Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF, were responsible for supervising and monitoring JONATHAN KUKAR-TEKANO. Defendants DOE 2 to 10 had the ability to monitor JONATHAN KUKAR-TEKANO with closed-circuit television (CCTV) video feed and direct-view safety checks. Defendants DOE 2 to 10 failed to conduct timely and adequate monitoring of JONATHAN KUKAR-TEKANO including by observing, intervening, and preventing JONATHAN KUKAR-TEKANO's suicide attempt.

133.    Around 9:00 p.m., Defendants DOE 2 to 10 reported observing JONATHAN KUKAR-TEKANO alive during a safety cell check.

134.    Around 9:50 p.m., Defendants DOE 2 to 10 reported observing JONATHAN KUKAR-TEKANO hanging from a vent by a bedsheet tied at the back of his neck. Defendants DOE 2 to 10 reported that JONATHAN KUKAR-TEKANO was cut down from a hanging position, resuscitation efforts were attempted, and JONATHAN KUKAR-TEKANO was transported to the hospital.

135.    Around 10:30 p.m., an emergency room nurse reported that JONATHAN KUKAR-TEKANO was admitted into Barton Memorial Hospital, 2170 South Avenue, South Lake Tahoe, CA 96150.

136.    On February 28, 2025, around 3:58 a.m., Defendant JULES HOGANSON reported a SOAP note regarding JONATHAN KUKAR-TEKANO, including: "Subjective … : EMERGENCY RESPONSE"; "Objective: … : LATE ENTRY FOR 02/27/2025 @ 2150. Timeline of events: @ 2150, call announced over radio for emergency response from custody staff and from nurse to cell E:13, with report that inmate was discovered hanging from the neck, by a thin blanket, and was unresponsive. Nurse arrived at scene @ 2150 hours while inmate was cut down and pulled out of cell by custody. CPR/life saving measures were initiated immediately (@ 2150) by COs and nurse rotating positions every few cycles of resus[c]itation efforts. @ 2153, AED electrode patches were applied by nurse and AED prompts followed. (-) respirations, (+) cyanosis and no (carotid) pulses palpated. CPR continued by COs and nurse until 2159 when EMS arrived on scene. @ 2200 hours, paramedics assumed care/ life[-]saving procedures. @ 2210, a pulse was detected. EMS exited E-Pod with patient-transported Code 3 to Barton Memorial Hospital Emergency Department."

137.    Medical testing reported that JONATHAN KUKAR-TEKANO sustained an anoxic brain injury and multiple rib fractures.

138.    On March 6, 2025, at 11:11 a.m., JONATHAN KUKAR-TEKANO was pronounced dead.

139.    On March 21, 2025, JONATHAN KUKAR-TEKANO's cause of death was reported as "Hanging."

140.    Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20 exhibited deliberate indifference to JONATHAN KUKAR-TEKANO's safety, security, and/or serious medical needs, where an intentional decision was made with respect to the conditions of his confinement and serious condition which put JONATHAN KUKAR-TEKANO at substantial risk of suffering serious harm, and reasonable available measures to abate those risks were not taken, including by performing a comprehensive mental health screening; performing a comprehensive classification and

31

1    housing assignment; providing medical/mental health treatment; performing a comprehensive suicide

2    risk assessment; timely and adequate monitoring and observation; obtaining informed opinions from

3    medical/mental health professionals; and/or recommending urgent referral to an outside provider, and a

4    reasonable official in the circumstances would have appreciated the high degree of risk involved,

5    observed the need for intervention and immediate medical care, and responded appropriately to

6    JONATHAN KUKAR-TEKANO's safety risks and medical emergency, based on the documented

7    mental health history and present conditions.

8         141.    Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE,

9    JEFF LEIKAUF, and DOE 2 to 10 failed to utilize appropriate policies, training, standards, and

10   procedures including in violation of California Code of Regulations title 15 § 1030 (Suicide Prevention

11   Program), § 1055 (Use of Safety Cell), § 1207 (Medical Receiving Screening), § 1027.5 (Safety Checks),

12   § 1208 (Access to Treatment), § 1210 (Individualized Treatment Plans), § 1211 (Sick Call), § 1213

13   (Detoxification Treatment), § 3365 (Suicide Prevention and Response); California Commission on Peace

14   Officer Standards and Training (POST) Learning Doman 31 (Custody), Learning Domain 37 (People

15   with Disabilities); and El Dorado County Sheriff's Office Custody Manual Policy 504 (Intake & Inmate

16   Reception), Policy 508 (Inmate Safety Checks), Policy 510 (Special Management Inmates), Policy 516

17   (Inmate Classification), Policy 604 (Inmates with Disabilities), Policy 702 (Access to Health Care),

18   Policy 706 (Referrals and Coordination of Specialty Care), Policy 722 (Medical Screening), Policy 724

19   (Mental Health Services), Policy 726 (Mental Health Screening and Evaluation), Policy 734

20   (Detoxification and Withdrawal), Policy 736 (Administration of Psychotropic Medication), Policy 740

21   (Suicide Prevention and Intervention).

22        142.    Defendants COUNTY OF EL DORADO, CALIFORNIA FORENSIC MEDICAL

23   GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE

24   MOSHER, STEPHEN PITTELLI, and DOE 11 to 20 failed to utilize appropriate policies, training,

25   standards, and procedures including in violation of California Code of Regulations title 15 § 1030

26   (Suicide Prevention Program), § 1055 (Use of Safety Cell), § 1207 (Medical Receiving Screening), §

27   1027.5 (Safety Checks), § 1208 (Access to Treatment), § 1210 (Individualized Treatment Plans), § 1211

28   (Sick Call), § 1213 (Detoxification Treatment), § 3365 (Suicide Prevention and Response); National

32

Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails Standard J-A-01 (Access to Care), Standard J-B-05 (Suicide Prevention and Intervention), Standard J-C-04 (Health Training for Correctional Officers), Standard J-C-07 (Staffing), Standard J-D-08 (Hospitals and Specialty Care), Standard J-E-02 (Receiving Screening), Standard J-E-04 (Initial Health Assessment), Standard J-E-08 (Nursing Assessment Protocols and Procedures), Standard J-E-09 (Continuity, Coordination, and Quality of Care During Incarceration), Standard J-F-01 (Ongoing Care for Chronic Illness), Standard J-F-04 (Medically Supervised Withdrawal and Treatment), Standard J-G-02 (Segregated Inmates); Institute for Medical Quality (IMQ) Standard 110 (Transfer of Inmates with Acute Illness), Standard 204 (Basic Training for Correctional Personnel), Standard 302 (Receiving Screening), Standard 303 (Substance Abuse), Standard 304 (Access to Treatment), Standard 306 (Clinic Care), Standard 307 (Health Inventory & Communicable Disease Screening), Standard 312 (Suicide Prevention), Standard 318 (Standardized Procedures/Treatment Protocols), Standard 319 (Continuity of Care), Standard 328 (Health Maintenance); American Correctional Association (ACA) Standard 4-ALDF-2A-15 (Staffing), Standard 4-ALDF-5A-04, 4-ALDF-5A-06, 4-ALDF-5A-07 (Substance Abuse Programs), Standard 4-ALDF-7B-10 (Training and Staff Development), Standard 4-ALDF-4C-01 (Access to Care), Standard 4-ALDF-4C-05 (Referrals), Standard 4-ADLF-4C-22 (Health Screens), Standard 4-ALDF-4C-24, 4-ALDF-4C-25 (Health Appraisal), Standard 4-ALDF-4C-32 (Suicide Prevention and Intervention), Standard 4-ALDF-4C-33 (Suicide Clothing), Standard 4-ALDF-4C-36 (Detoxification), Standard 4-ALDF-4C-37 (Management of Chemical Dependency), Standard 4-ALDF-4D-20 (Transfer), Standard 1-HC-1A-01 (Access to Care), Standard 1-HC-4A-05 (Staffing/Referrals), Standard 1-HC-4A-07 (Transfers), Standard 1-HC-1A-19 (Health Screens), Standard 1-HC-1A-22, 1-HC-1A-23 (Health Appraisal), Standard 1-HC-1A-33 (Detoxification), Standard 1-HC-1A-34 (Management of Chemical Dependency); and Wellpath Policies & Procedures Policy HCD-110_B-05 (Suicide Prevention and Intervention Program), Policy HCD-110_E-02 (Receiving Screening), Policy HCD-110_E-05 (Mental Health Screening and Evaluation), Policy HCD-110_F-03 (Mental Health Services), Policy HCD-110_G-02A (Safety Cell Placement and Retention), Policy HCD-110_G-02 (Segregated Inmates).

### California Public Records Act Request

143.    On April 4, 2025, Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE

33

KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO sent a California Public Records Act (CPRA) request to the custodians of records for Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE seeking, *inter alia*, "all records relating to the report, investigation, findings, and administrative discipline related to Jonathan Kukar-Tekano, including all records from the beginning on the date of his incarceration at the South Lake Tahoe Jail until the date that this request was received," including "the name(s) of all involved personnel…"

144.    On April 16, 2025, Defendant EL DORADO COUNTY SHERIFF'S OFFICE withheld and refused to produce any records or information, including responding that "[t]he report, statements, records, photos and[/]or videos you requested are not releasable pursuant to California Government Code section 7923.600 and California Government Code section 7927.200."

145.    Defendant COUNTY OF EL DORADO withheld and refused to produce any records or information and did not respond.

## POLICY / CUSTOM ALLEGATIONS

146.    Defendant JEFF LEIKAUF has served as sheriff for Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE since January 2023. Defendant JEFF LEIKAUF has been employed by Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE since 1990, in various capacities including as a correctional officer, deputy sheriff, school resource officer, detective, sergeant, lieutenant, and sheriff.

147.    Defendant JEFF LEIKAUF is and was a final policymaking official for Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE, including as it relates to the maintenance and operation of jail and detention facilities; training, supervision, and discipline of staff acting under his command; and the safety and security of inmates in his custody. Defendant JEFF LEIKAUF is and was responsible for the provision of healthcare care to inmates, detainees, and prisoners in his custody at jail facilities, including assessment of inmates, detainees, and prisoners for medical emergencies, medical needs, and all policies, procedures, customs, hiring, staffing, supervision, and training related thereto. El Dorado County Sheriff's Office Policy Manual Policy 203 (Chain of Command).

148.    Defendant DOE 1 is the Health Services Administrator for Defendants CALIFORNIA

34

FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. in the South Lake Tahoe Jail. Defendant DOE 1 is and was a final policymaking official for Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC., including as it relates to the provision of healthcare services to inmates, detainees, and prisoners at jail facilities; training, supervision, and discipline of staff acting under their command; and the safety and security of inmates in their care. Defendant DOE 1 is and was responsible for the provision of healthcare care to inmates, detainees, and prisoners in their care at jail facilities, including assessment of inmates for healthcare emergencies, healthcare needs, and all policies, procedures, customs, hiring, staffing, supervision, and training related thereto.

149.    Standards: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1's practices and customs are inconsistent with state law, applicable industry standards, and their own policies and procedures including:

(a)    California Code of Regulations title 15 § 1030 (Suicide Prevention Program), § 1055 (Use of Safety Cell), § 1207 (Medical Receiving Screening), § 1027.5 (Safety Checks), § 1208 (Access to Treatment), § 1210 (Individualized Treatment Plans), § 1211 (Sick Call), § 1213 (Detoxification Treatment), § 3365 (Suicide Prevention and Response).

(b)    California Commission on Peace Officer Standards and Training (POST) Learning Doman 31 (Custody), Learning Domain 37 (People with Disabilities).

(c)    El Dorado County Sheriff's Office Custody Manual Policy 504 (Intake & Inmate Reception), Policy 508 (Inmate Safety Checks), Policy 510 (Special Management Inmates), Policy 516 (Inmate Classification), Policy 604 (Inmates with Disabilities), Policy 702 (Access to Health Care), Policy 706 (Referrals and Coordination of Specialty Care), Policy 722 (Medical Screening), Policy 724 (Mental Health Services), Policy 726 (Mental Health Screening and Evaluation), Policy 734 (Detoxification and Withdrawal), Policy 736 (Administration of Psychotropic Medication), Policy 740 (Suicide Prevention and Intervention).

(d)    National Commission on Correctional Health Care (NCCHC) Standards for Health

35

Services in Jails Standard J-A-01 (Access to Care), Standard J-B-05 (Suicide Prevention and Intervention), Standard J-C-04 (Health Training for Correctional Officers), Standard J-C-07 (Staffing), Standard J-D-08 (Hospitals and Specialty Care), Standard J-E-02 (Receiving Screening), Standard J-E-04 (Initial Health Assessment), Standard J-E-08 (Nursing Assessment Protocols and Procedures), Standard J-E-09 (Continuity, Coordination, and Quality of Care During Incarceration), Standard J-F-01 (Ongoing Care for Chronic Illness), Standard J-F-04 (Medically Supervised Withdrawal and Treatment), Standard J-G-02 (Segregated Inmates).

(e)    Institute for Medical Quality (IMQ) Standard 110 (Transfer of Inmates with Acute Illness), Standard 204 (Basic Training for Correctional Personnel), Standard 302 (Receiving Screening), Standard 303 (Substance Abuse), Standard 304 (Access to Treatment), Standard 306 (Clinic Care), Standard 307 (Health Inventory & Communicable Disease Screening), Standard 312 (Suicide Prevention), Standard 318 (Standardized Procedures/Treatment Protocols), Standard 319 (Continuity of Care), Standard 328 (Health Maintenance).

(f)    American Correctional Association (ACA) Standard 4-ALDF-2A-15 (Staffing), Standard 4-ALDF-5A-04, 4-ALDF-5A-06, 4-ALDF-5A-07 (Substance Abuse Programs), Standard 4-ALDF-7B-10 (Training and Staff Development), Standard 4-ALDF-4C-01 (Access to Care), Standard 4-ALDF-4C-05 (Referrals), Standard 4-ADLF-4C-22 (Health Screens), Standard 4-ALDF-4C-24, 4-ALDF-4C-25 (Health Appraisal), Standard 4-ALDF-4C-32 (Suicide Prevention and Intervention), Standard 4-ALDF-4C-33 (Suicide Clothing), Standard 4-ALDF-4C-36 (Detoxification), Standard 4-ALDF-4C-37 (Management of Chemical Dependency), Standard 4-ALDF-4D-20 (Transfer), Standard 1-HC-1A-01 (Access to Care), Standard 1-HC-4A-05 (Staffing/Referrals), Standard 1-HC-4A-07 (Transfers), Standard 1-HC-1A-19 (Health Screens), Standard 1-HC-1A-22, 1-HC-1A-23 (Health Appraisal), Standard 1-HC-1A-33 (Detoxification), Standard 1-HC-1A-34 (Management of Chemical Dependency).

(g)    Wellpath Policies & Procedures Policy HCD-110_B-05 (Suicide Prevention and Intervention Program), Policy HCD-110_E-02 (Receiving Screening), Policy HCD-110_E-05 (Mental Health Screening and Evaluation), Policy HCD-110_F-03 (Mental Health Services), Policy HCD-110_G-02A (Safety Cell Placement and Retention), Policy HCD-110_G-02 (Segregated Inmates).

36

150.   <u>Classification / Housing</u>: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintain inadequate policies and customs relating to the classification and housing assignment of inmates including through inadequate consideration of information and risk factors. For example:

(a)   On November 29, 2024, 50-year-old Brandon Canfield, a pre-trial detainee, died while housed in the general population at the South Lake Tahoe Jail. On information and belief, the decedent died as a result of the jail staff's inadequate classification and housing decisions.

(b)   On June 19, 2024, 36-year-old James Bond, a sentenced inmate, died at the Renown Hospital after being transported from the South Lake Tahoe Jail. On information and belief, the decedent died as a result of the jail staff's inadequate classification and housing decisions.

(c)   On April 10, 2024, 63-year-old Walter J. Anderson, a sentenced inmate, died at the Barton Memorial Hospital after being transported from the South Lake Tahoe Jail. Medical records identified the preliminary cause of death as esophageal rupture and acute hypoxic respiratory failure. On information and belief, the decedent died as a result of the jail staff's inadequate classification and housing decisions.

(d)   On October 21, 2022, 31-year-old Jonathan Madrigal, a pre-trial detainee, died while housed in a holding cell in the booking area at the El Dorado County Jail. On October 18, 2022, the decedent was booked into the jail while under the influence and housed in general population. The decedent's health deteriorated, he was unable to stand or walk on his own, he soiled himself, and his "dark brown and chunky" vomit was found on the floor of his cell. A contract nurse, Samantha Polfer, ordered that the decedent's housing be changed from general population to a holding cell in the booking area were the decedent could be closely monitored. At 3:41 a.m., the decedent was loaded into a wheelchair and confined in a holding cell. Around 3:52 a.m., the nurse briefly looked into the window of the decedent's cell but did not otherwise check on the decedent. The nurse falsely reported that she distributed detox medications to the decedent at 6:35 a.m., and conducted a Clinical Opiate Withdrawal Scale (COWS) evaluation of the decedent at 8:05 a.m., but surveillance recordings disproved these reports. The custody staff also ignored the decedent's deteriorating health while he was confined in the

holding cell. Around 8:50 a.m., the decedent was discovered unconscious in the holding cell with "brown liquid … coming out of his nose and mouth" and "some black and gray fluid on the floor" of the cell. By 9:10 a.m., the decedent was declared dead. A civil rights lawsuit was filed. *Estate of Madrigal v. Country of El Dorado*, No. 2:23-cv-02673-DC-AC (E.D. Cal.). The case remains pending.

(e)     The 2021–22 Grand Jury Report El Dorado County found, for the South Lake Tahoe Jail: "Since the previous virtual Grand Jury inspection in 2020-21, one inmate committed suicide, and there were nine attempted suicides." For the Placerville Jail, "there were four attempted suicides." For the Juvenile Treatment Center, "there were eight attempted suicides." Inspection of County Jails and Juvenile Treatment Center at pp. 4–5 (June 16, 2022), available at: <https://www.eldoradocounty.ca.gov/files/assets/county/v/1/documents/public-safety-amp-justice/grand-jury/2021_2022/case-21-03-inspection-of-county-jails-and-juvenile-treatment-center.pdf>.

151.     <u>Mental Health Services</u>: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintain inadequate policies and customs relating to the provision of mental health services to inmates. For example:

(a)     The 2021–22 Grand Jury Report El Dorado County found, for the South Lake Tahoe Jail: "Since the previous virtual Grand Jury inspection in 2020-21, one inmate committed suicide, and there were nine attempted suicides." For the Placerville Jail, "there were four attempted suicides." For the Juvenile Treatment Center, "there were eight attempted suicides." Inspection of County Jails and Juvenile Treatment Center at pp. 4–5 (June 16, 2022), available at: <https://www.eldoradocounty.ca.gov/files/assets/county/v/1/documents/public-safety-amp-justice/grand-jury/2021_2022/case-21-03-inspection-of-county-jails-and-juvenile-treatment-center.pdf>.

152.     <u>Staffing</u>: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintain inadequate policies and customs relating to staffing personnel at the jail. For example:

(a)     The 2024–25 Grand Jury Report El Dorado County found, for the South Lake Tahoe Jail: "Daily staffing Includes one Commander, five Sergeants, and 27 officers on the floor.

1  Allocated staff positions are about 50% filled. Existing staff work significant overtime to meet schedule

2  demands." Placerville and South Lake Tahoe Jail Inspections at pp. 9–10 (Feb. 11, 2025), available at:

3  <https://www.eldoradocounty.ca.gov/files/assets/county/v/1/documents/public-safety-amp-justice/grand-

4  jury/2024-2025/25-02-detention-facilities-report.pdf>.

5          (b)     The 2023–24 Grand Jury Report El Dorado County found, for the South Lake

6  Tahoe Jail: "Allocated staff positions are approximately 50% filled. As a result, existing staff work

7  significant overtime to meet schedule demands." Placerville and South Lake Tahoe Jail Inspections at p.

8  8 (April 5, 2024), available at:

9  <https://www.eldoradocounty.ca.gov/files/assets/county/v/1/documents/public-safety-amp-justice/grand-

10  jury/2023-2024/slt-placerville-inspection-report-final.pdf>.

11       153.    <u>Monitoring / Supervision</u>: Defendants COUNTY OF EL DORADO, EL DORADO

12  COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP,

13  INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintain inadequate

14  policies and customs relating to the monitoring and supervision of inmates including failing to conduct

15  timely and adequate direct-view safety checks sufficient to determine whether inmates' presentation

16  indicates the need for medical treatment, including in violation of California Code of Regulations title 15

17  § 1027.5 (Safety Checks) and El Dorado County Sheriff's Office Custody Manual Policy 508 (Inmate

18  Safety Checks). For example, on October 21, 2022, from 3:41 a.m. to 8:05 a.m., jail staff, including

19  medical and custody staff, failed to conduct sufficient safety checks on the inmate who was known to be

20  suffering from withdrawal and so ill that he was unable to stand. *Estate of Madrigal v. Country of El*

21  *Dorado*, No. 2:23-cv-02673-DC-AC, ECF No. 25 ¶¶ 75–161 (E.D. Cal. June 21, 2024). The inmate died

22  due to the jail staff's deliberate indifference to obvious medical needs.

23       154.    <u>California Forensic Medical Group, Inc. / Wellpath LLC</u>: Defendants COUNTY OF EL

24  DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and JEFF LEIKAUF employ private for-

25  profit companies, Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH

26  LLC, and WELLPATH MANAGEMENT, INC., to deliver constitutionally-mandated healthcare services

27  to inmates, detainees, and prisoners, with knowledge that services provided are non-compliant with the

28  contractually bargained-for services, constitutionally inadequate, and unlawful. For example:

1        (a)     Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH

2  LLC, and WELLPATH MANAGEMENT, INC.'s contracts require that they to pay for all outside or

3  hospital care for inmates, detainees, or prisoners up to $25,000, which creates a financial disincentive to

4  send patients off-site for necessary and emergency care.

5        (b)     During the year 2022, approximately 155 persons committed suicide, including at

6  least 122 hangings, at facilities where Defendants CALIFORNIA FORENSIC MEDICAL GROUP,

7  INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. were contracted to provide

8  healthcare services.

9        (a)     By 2015, over a 10-year period, facilities contracting with Defendant

10  CALIFORNIA FORENSIC MEDICAL GROUP, INC. had a rate of suicide 50% higher than other

11  facilities in California, and at least three California county's grand juries had criticized Defendant

12  CALIFORNIA FORENSIC MEDICAL GROUP, INC.'s role in inmate deaths. According to California

13  Department of Justice records, 72 people committed suicide in the last decade while in a jail served by

14  Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC., and the company's suicide prevention

15  efforts have been challenged in the federal lawsuits in multiple municipalities, including Monterey, Lake,

16  and Ventura Counties. <u>The Sacramento Bee</u>, *California for-profit company faces allegations of*

17  *inadequate inmate care* (Jan. 17, 2015), available at: <https://amp.sacbee.com/article7249637.html>.

18        (c)     "Wellpath provides health care in 34 of California's 56 county jail systems…" "In

19  multiple instances, the for-profit company has secured multimillion-dollar county contracts without

20  facing a single competitive bid…" "Wellpath hasn't lost a single contract to provide health care in a

21  California county jail since its 2018 founding, even when serious allegations have surfaced." Wellpath is

22  subject to "more than 1,000 lawsuits in U.S. federal courts, filed by prisoners, their families and civil

23  rights groups, naming the company as a defendant, and three recent investigations involving Wellpath's

24  quality of care by the U.S. Department of Justice." There exist "four FBI investigations — three into the

25  company's health care delivery and one into bribery allegations involving Gerard 'Jerry' Boyle, the

26  founder of one of the two companies that merged to become Wellpath and who pleaded guilty to

27  conspiracy to commit mail fraud." "In San Luis Obispo County, the Justice Department concluded that

28  Wellpath did not provide a 'significant' improvement over a jail's former government-run system after

1   the company's takeover in February 2019 — a system whose deficient care had prompted the

2   investigation." "In a 2020 probe into the Massachusetts Department of Corrections, the DOJ found

3   Wellpath's mental health care was so abysmal that it may have violated the U.S. Constitution's

4   protections against 'cruel and unusual punishment,' with 'vague' policies that increased the risk of self-

5   harm and suicide among mentally ill prisoners" and "[a] follow-up report [in 2023] revealed that

6   Wellpath had low staffing levels and high rates of unlicensed mental health providers." "[Another]

7   investigation focused on Correct Care Solutions, which became Wellpath in 2018 after merging with

8   California Forensic Medical Group," where "[i]nvestigators found that the company failed to develop a

9   quality-control plan and overbilled the state for its medical services in a Florida prison. The Federal

10  Bureau of Prisons, which had awarded the contract to CCS, agreed with the DOJ's recommendations on

11  how it could better monitor the company's performance." "A 2020 Reuters investigation of large jails

12  found that patients at institutions using Wellpath and other private providers died at higher rates than at

13  jails with public health care. The investigation found that from 2016 to 2018, for every 10,000 inmates in

14  Wellpath's care, 16 died; in publicly run jails, that rate was 13 per 10,000." "[Wellpath] routinely fails to

15  adequately staff California county jails with qualified nurses and doctors, meaning that sick patients often

16  must wait weeks — or, in emergency situations, crucial minutes or hours — to be treated." "In Yuba

17  County, attorneys appointed by the local Superior Court to monitor the jail's compliance with a decades-

18  old settlement agreement alleging poor conditions found that Wellpath consistently failed to staff enough

19  nurses and therapists to abide by the settlement's terms in both 2020 and 2021." "At the Sonoma County

20  Jail, the National Union of Healthcare Workers, a group that represents many Wellpath nurses in

21  California, sent a report to the Sonoma County Board of Supervisors finding that from December 2021

22  through March 2022, the jail staffed less than two-thirds of the nurse-hours that were required by their

23  contract. The staffing levels in the jail were so low last March, the union's report found, that for every

24  500 prisoners in the Sonoma system, just one registered nurse was on duty at any given time." "Three of

25  the five [former Wellpath employees questioned] said they were often responsible for a number of

26  patients that felt unsafe or impossible to manage," including one former nurse stating: "I don't feel safe

27  with 600 patients. That's not an OK ratio. Nowhere in the world is that an OK ratio." San Francisco

28  Chronicle, *Its patients are 'literally a captive market.' Is this California health care giant failing them?*

41

1    (July 25, 2023), available at: <https://www.sfchronicle.com/california/article/wellpath-health-care-jails-
2    17917489.php>.

3         (d)    Defendant WELLPATH LLC "has been sued nearly 500 times over the last five

4    years across the country, according to an online review of lawsuits." KTVU FOX 2, Brooks Jarosz , Lisa

5    Fernandez & Simone Aponte, *Santa Rita Jail's medical provider is target of lawsuits, complaints about*

6    *lack of care* (May 5, 2021), available at: <https://www.ktvu.com/news/santa-rita-jails-medical-provider-

7    is-target-of-lawsuits-complaints-about-lack-of-care>.

8         (e)    In 2015, Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. entered

9    into a class action settlement which required it to address issues of inadequate healthcare, inadequate

10   staffing, and accommodations for disabled prisoners and serious safety problems at the Monterey County

11   Jail. *Hernandez v. County of Monterey*, No. 5:13-cv-02354-BLF, ECF No. 485 (N.D. Cal. May 15,

12   2015). Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. failed completely to comply

13   with the terms of the settlement, and the court issued an order compelling its compliance. *Id*. ECF No.

14   617 (N.D. Cal. Nov. 1, 2017).

15        (f)    In August 2021, the Civil Rights Division and the United States Attorney's Office

16   for the Central District of California completed an investigation into the conditions of confinement at the

17   San Luis Obispo County Jail, where medical and mental health services were operated by Defendant

18   CALIFORNIA FORENSIC MEDICAL GROUP, INC. since February 2019. Therein, the investigative

19   report concluded, *inter alia*: "Wellpath and its staff appear not to take seriously prisoner grievances or

20   the grievance process as a mechanism for prisoners to raise legitimate medical concerns"; "Wellpath fails

21   to provide adequate staffing to prevent delays in medical care that place prisoners at substantial risk of

22   serious harm"; "[t]he Jail provided no evidence that Wellpath has corrected these deficiencies" related to

23   failure to "conduct critical incident reviews, and when prisoners died, death reviews … includ[ing] a

24   meaningful analysis into causal factors or systemic issues"; "Wellpath does not routinely analyze the

25   quality of care that it provides"; and "Wellpath in fact seems to discourage routine follow-up mental

26   health care." <https://www.justice.gov/opa/press-

27   release/file/1429076/download?utm_medium=email&utm_source=govdelivery>.

28        (g)    "HIG Capital's California Forensic Medical Group (CFMG), now part of

                                            42

Wellpath, and its clients have agreed to pay out millions of dollars in settlements to families of incarcerated people who have alleged negligence in the care the company provided." Private Equity Stakeholder Project, *HIG Capital's and Wellpath's Correctional Healthcare Investment Risks* (July 2019), available at: <https://pestakeholder.org/wp-content/uploads/2019/07/HIG-Capitals-Correctional-Healthcare-Investment-Risks-PESP-070819.pdf>.

        (h)     "Analysis of California department of justice data by Fairwarning found that about 200 inmates died under the care of California Forensic Medical Group (CFMG), the Californian arm of the [Correctional Medical Group Companies], between 2004 and 2014. Excluding homicide, it works out at a death rate of 1.7 per 1,000 inmates at CFMG jails compared with 1.5 in other jails." Todd Murphy, a director of business development for Correctional Medical Group Companies, stated that "the main reason counties are choosing to outsource their jail healthcare is not to reduce daily costs, but for the comfort of knowing that a lawsuit brought by the family of a dead inmate would be brought against the company and not the county. 'We provide a full partnership to our county partners,' he said. 'But the biggest thing we do is indemnify the county against risk and reliability, do everything we can to keep them out of trouble.'" Rupert Neate, *Welcome to Jail Inc: how private companies make money off US prisons* (June 16, 2016), available at: <https://www.theguardian.com/us-news/2016/jun/16/us-prisons-jail-private-healthcare-companies-profit>.

        (b)     Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. is subject to, and fails to comply with, a consent decree based on services in Alameda County's jail facilities. *Babu v. Ahern*, No. 5:18-cv-07677-NC, ECF No. 436 (N.D. Cal. Feb. 7, 2022). *See* <https://rbgg.com/santa-rita-consent-decree/>; <http://grandjury.acgov.org/grandjury-assets/docs/2021-2022/Grand.Jury.Report.2022.for.ITD.Web.pdf>; KQED, *Grand Jury: Major Health and Safety Violations at Santa Rita Jail Require 'Urgent Attention'* (June 30, 2022), available at: <https://www.kqed.org/news/11918230/grand-jury-major-health-and-safety-violations-at-santa-rita-jail-require-urgent-attention>. Specifically, Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC.'s care at Alameda County's jail facilities has resulted in more than 45 deaths, including 19 suicides. *See, e.g.*, NBC Bay Area, *Feds Say Santa Rita Jail Violates Rights of Mentally Ill* (April 24, 2021), available at: <https://www.nbcbayarea.com/news/local/east-bay/feds-say-santa-rita-jail-violates-rights-

of-mentally-ill/2527370/>; <u>KTVU FOX 2</u>, *DOJ finds mental health care, overuse of isolation at Santa Rita Jail unconstitutional* (April 22, 2021), available at: <https://www.ktvu.com/news/doj-finds-mental-health-care-overuse-of-isolation-at-santa-rita-jail-unconstitutional>; <u>KTVU FOX 2</u>, *A look at the 45 inmates who have died at Santa Rita Jail in the last five years* (Oct. 4, 2019, *updated* Jan. 17, 2020), available at: <https://www.ktvu.com/news/a-look-at-the-45-inmates-who-have-died-at-santa-rita-jail-in-the-last-five-years>.

      (c)     In August 2023, Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. and the County of Alameda paid $2,000,000 to settle a federal civil rights lawsuit involving the suicide of a 37-year-old man at a county jail. *Estate of Brown v. County of Alameda*, No. 3:22-cv-05457-VC (N.D. Cal.).

      (d)     Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC.'s care at Solano County's jail facilities has resulted in at least four suicides in less than 10 years. <u>Vallejo Sun</u>, Scott Morris, *2022 was deadliest year in Solano County jails in 24 years* (Dec. 19, 2022), available at: <https://www.vallejosun.com/2022-was-deadliest-year-in-solano-county-jails-in-24-years/>. Specifically, in-custody deaths include: Douglas Tuttle (died December 2, 2014); Jeremiah Conaway (died April 10, 2019), *LeMoon v. Cal. Forensic Med. Grp.*, No. 4:20-cv-02552-PJH (N.D. Cal.); Salvador Romero (died September 4, 2022), *Estate of Romero v. County of Solano*, No. 2:23-cv-00523-JAM-AC (E.D. Cal.); and Kurt DeSilva (died January 23, 2023).

      (e)     In August 2018, Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. and the County of El Dorado paid $1,050,000 to settle a federal civil rights lawsuit involving the suicide of a 34-year-old man at a county jail. <u>Mountain Democrat</u>, *Spies family awarded more than $1 million for wrongful death* (Aug. 31, 2018), available at: <https://www.mtdemocrat.com/news/spies-family-awarded-more-than-1-million-for-wrongful-death/>.

      (f)     In June 2018, Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. and the County of Lake paid $2,000,000 to settle a federal civil rights lawsuit involving the suicide of an 86-year-old woman at a county jail. The case revealed the "jail's medical services provider was in violation of state regulations" and Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. utilized "lesser trained vocational nurses to make key medical and mental health decisions for prisoners."

44

The Press Democrat, *Lake County settles jail suicide case for $2 million* (June 18, 2018), available at: <https://www.pressdemocrat.com/article/news/lake-county-settles-jail-suicide-case-for-2-million/?sba=AAS>.

(i)     In 2013–2014, the Santa Cruz County Grand Jury addressed multiple deaths in the county jail where Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. was contracted to provide healthcare services. The investigation reviewed five in-custody deaths between August 2012 and July 2013, including two suicides by hanging and four deaths at the jail. Each of the persons who died in-custody had medical problems, mental health problems, or both. In each death case, the report identified failures at critical points in the process, sometimes finding that persons were incorrectly classified, not properly monitored, or inadequately treated by Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. <https://www.co.santa-cruz.ca.us/Portals/0/County/GrandJury/GJ2014_final/2013-2014_SantaCruzCountyGrandJuryFinalReport_complete.pdf>.

(j)     In August 2015, Pierce County, Washington, cancelled its contract with Defendant WELLPATH LLC. The next month, Pierce County's Prosecuting Attorney sent Defendant WELLPATH LLC a letter in response to a demand for payment. In that letter, the Prosecuting Attorney laid out the "many areas in which [Wellpath] was in default," providing the following list: failure to verify medications at booking; delays in care; poor quality of care; poor record keeping at every level; failure to triage; lag times in getting reports to providers; continued staff shortages and almost weekly turnover; constant lack of leadership; lack of trained personnel; unscheduled shifts; failure to provide basic services; failure to timely review or address inmate requests for medical services; significant pharmacy problems; inmates not getting their medications; staff failure to keep medical records on patients; and many others. The letter continued, "Indeed, the only things [Wellpath] can fault the County for are (1) believing [Wellpath] when they made assurances that they would implement measures to bring their operation of the clinic up to medical standards and (2) giving [Wellpath] time to accomplish it." The letter explained that "[a] lawsuit against Pierce County would flush out [Wellpath's] deplorable performance in running the medical clinic, which would not only result in considerable cost and embarrassment to [Wellpath], but would also provide evidence to support claims filed by other institutions who suffered the same disappointment as Pierce County." The letter noted that the County

"compiled independent, detailed documentation of countless errors by [Wellpath] staff that "will shock the conscience of the court." The letter concluded by stating that "[a] jury would likely find that [Wellpath's] operation of the jail medical clinic was incompetent, unprofessional and morally reprehensible." In March 2019, a jury found that Defendant WELLPATH LLC had violated its contract with Pierce County and ordered it to pay the County $1,560,000.

(k)     In January 2016, Dillon Blodgett committed suicide at the detention facility in Montrose County, Colorado. Blodgett had been placed in solitary confinement and had reported suicidal ideations and a previous suicide attempt. Defendant WELLPATH LLC was responsible for providing medical and mental health care at the Montrose County facility but failed adequately to do so. In November 2017, Blodgett's estate sued Defendant WELLPATH LLC, alleging its long history of inadequate medical and mental health care provided in Colorado and across the country.

(l)     In March 2016, sheriff Terry Box of the Collin County (Texas) Sheriff's Office wrote that, when Defendant WELLPATH LLC was providing the medical and mental health care at his jail, "we had a list of 80 inmates waiting to see the psychiatrist." With a new provider, which is not Defendant WELLPATH LLC, he wrote that "[n]ow we don't have a waiting list. Most inmates are seen within 48 to 72 hours and sometimes the same day as the request or referral is made."

(m)     In August 2017, Teresa Nall twice attempted suicide in the Kitsap County (Washington) Jail. After her first suicide attempt, Nall was placed in a solitary crisis cell for a brief period. Shortly after a counselor released her from that cell, Nall attempted suicide again and suffered serious permanent injuries. Nall did not see a psychiatrist, psychologist, or medical doctor after her first suicide attempt. Defendant WELLPATH LLC was responsible for providing medical and mental health care at the Kitsap County facility but failed adequately to do so.

(n)     In September 2017, Jesses Binam hung himself in the Mesa County (Colorado) Detention Center. Binam died from his injuries after being transferred to a local hospital. During his week in custody, Binam made suicide statements and required medication and treatment for serious mental illness. He was taken off suicide watch and moved to administrative segregation because of his behavior. He then hung himself in the segregation cell. Defendant WELLPATH LLC was responsible for providing medical and mental health care at the facility but failed adequately to do so.

46

(o)    In October 2017, Fulton County (Georgia) notified Defendant WELLPATH LLC that it was terminating for cause its services contract to provide medical services for inmates at the Fulton County Jail. The termination letter described a series of uncured deficiencies and noted that "most seriously, the Fulton County Sheriff's Office has reported five deaths at the Fulton County Jail in the last seventy-five days . . . ."

(p)    In November 2017, Sheriff Gary Simpson of the Kitsap County (Washington) Sheriff's Office sent a letter to Defendant WELLPATH LLC detailing several problems with the medical services being provided. Sheriff Simpson wrote, "In light of recent events and questions I have been asking our staff, I am finding the more I learn, the more questions arise regarding our partnership and relationship with [Wellpath]." The problems included staffing issues, questions about the "veracity and ability to effectively supervise and manage staff" of the health services administrator, and Defendant WELLPATH LLC's failure to perform initial health assessments in a timely fashion.

(q)    In January 2018, Brian Roundtree died by suicide at the Arapahoe County (Colorado) Detention Facility. Roundtree was suffering from severe mental illness and initially was placed on suicide watch when he was booked into the jail. Less than 24 hours later, he was removed from suicide watch by a counselor. He never saw a psychiatrist, a psychologist, or a medical doctor. He died of suicide later that day. Defendant WELLPATH LLC was responsible for providing medical and mental health care at this facility but failed adequately to do so.

(r)    In May 2018, commander Mike Anderson of the Clark County (Washington) Sheriff's Office sent a letter to Defendant WELLPATH LLC. Anderson noted that "[Wellpath] has always referred to Clark County as their flag ship on the west coast. During our discussion I communicated to you that your flag ship was taking on water and in danger of sinking. This is directly related to [Wellpath]'s inability to staff and provide mental health services from 1/12/18 as required by the contract." Anderson described problems staffing mental health positions for several months, along with a lengthy waiting list of people who needed to see a mental health professional. He concluded: "It is painfully obvious that there is disconnect somewhere in the communication process at the corporate level or other levels of management within [Wellpath]. I would like to know what your plan is to rectify this situation."

1    (s)    In July 2018, Janelle Butterfield was booked into the Josephine County (Oregon)

2 Jail. Butterfield had a history of severe mental illness that was known to the staff at the jail, including to

3 its medical and mental health providers. During her 40 days in custody, Butterfield did not see a single

4 doctor, nurse practitioner, physician's assistant, or nurse employed by the medical or mental health

5 providers. She was placed in a segregation unit and checked once a day by persons with an EMT

6 licenses. Herantipsychotic medication was discontinued without explanation after 16 days in custody.

7 After 40 days, she died by suicide in her segregation cell. Defendant WELLPATH LLC was responsible

8 for providing medical and mental health care at this facility but failed adequately to do so.

9    (t)    In March 2021, Carlos Patino Regalado died by suicide at the Monterey County

10 (California) Jail. Regalado had been in custody for about a month and had been on and off suicide watch

11 several times, sometimes for expressing suicidal thoughts, other times because of actual suicide attempts.

12 Earlier on the day he hung himself, Regalado had been on a suicide watch because he had just returned

13 from the hospital following a "psychiatric emergency." The watch was discontinued, and he was placed

14 in an isolation cell that contained a number of hanging points. Defendant WELLPATH LLC was

15 responsible for providing medical and mental health care at this facility but failed adequately to do so.

16    (u)    In April 2022, Carlos Chavez died by apparent suicide at the Monterey County

17 (California) Jail. Chavez had been on suicide watch; after being removed from the watch, he died less

18 than a day later. Defendant WELLPATH LLC was responsible for providing medical and mental health

19 care at this facility but failed adequately to do so.

20    155.    Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE,

21 JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC,

22 WELLPATH MANAGEMENT, INC., and DOE 1 do not meaningfully discipline, re-train, correct, or

23 otherwise penalize personnel involved in critical incidents where preventable deaths and injuries are

24 sustained by inmates, including those incidents described above. Defendants COUNTY OF EL

25 DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA

26 FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and

27 DOE 1's failure to correct the inadequate policies, customs, and practices described above, as evidenced

28 by the preventable deaths and injuries sustained by inmates, contributed to JONATHAN KUKAR-

48

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Estate of Kukar-Tekano v. County of El Dorado*, United States District Court, Eastern District of California, Case No. _____

1   TEKANO's injuries and death.

2       156.    Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE,

3   JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC,

4   WELLPATH MANAGEMENT, INC., and DOE 1 were or should have been on notice regarding the

5   need to discontinue, modify, or implement new and different versions of the deficient policies or customs

6   because the inadequacies and deficiencies were so obvious and likely to result in the violation of rights of

7   persons including JONATHAN KUKAR-TEKANO.

8       157.    Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE,

9   JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC,

10  WELLPATH MANAGEMENT, INC., and DOE 1's inadequate policies, customs, training, supervision,

11  and control of personnel and inmates were a moving force behind and contributed to the injuries and

12  death of JONATHAN KUKAR-TEKANO.

13                              **FIRST CLAIM**

14                          **Deliberate Indifference**

15              **(U.S. Const. Amend. XIV; 42 U.S.C. § 1983)**

16      158.    Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO (pursuant to California Code of

17  Civil Procedure § 377.30) asserts this Claim against Defendants COUNTY OF EL DORADO, EL

18  DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL

19  GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE

20  MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

21      159.    The allegations of the preceding paragraphs 1 to 157 are realleged and incorporated, to the

22  extent relevant and as if fully set forth in this Claim.

23      160.    *Individual Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN

24  PITTELLI, and DOE 2 to 20 inadequately screened, classified, assigned, housed, monitored, and/or

25  responded to JONATHAN KUKAR-TEKANO based on an immediate medical need, putting him at

26  substantial risk of suffering serious harm, without taking reasonable available measures to abate that risk,

27  where a reasonable official in the circumstances would have appreciated the high degree of risk involved,

28  in violation of the Fourteenth Amendment to the United States Constitution.

                                    49

161.   *Municipal / Supervisory Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintained policies or customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, in violation of the Fourteenth Amendment to the United States Constitution.

162.   Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to constitutional rights, or were wantonly or oppressively done.

163.   JONATHAN KUKAR-TEKANO was injured as a direct and proximate result of Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions, entitling Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO to receive compensatory (survival) and nominal damages against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20; and punitive damages against Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

WHEREFORE, Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO prays for relief as hereunder appears.

## SECOND CLAIM

### Title II of the Americans with Disabilities Act

### (42 U.S.C. § 12101, *et seq.*)

164.   Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO (pursuant to California Code of Civil Procedure § 377.30) asserts this Claim against Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE.

165.   The allegations of the preceding paragraphs 1 to 163 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

50

166.    Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE qualify as a "public entity" within the meaning of 42 U.S.C. § 12131(1)(A) and 28 C.F.R. § 35.104. JONATHAN KUKAR-TEKANO had an impairment that substantially limited one or more major life activities and had a record of such an impairment.

167.    *Vicarious Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 2 to 20 failed reasonably to accommodate JONATHAN KUKAR-TEKANO's disability, where they could have provided a reasonable accommodation, including by performing a comprehensive mental health screening; performing a comprehensive classification and housing assignment; providing medical/mental health treatment; performing a comprehensive suicide risk assessment; timely and adequate monitoring and observation; obtaining informed opinions from medical/mental health professionals; and/or recommending urgent referral to an outside provider, with deliberate indifference or reckless disregard to rights protected by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

168.    *Municipal / Vicarious Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintained policies or customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, with deliberate indifference or reckless disregard to rights protected by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

169.    Plaintiff JONATHAN KUKAR-TEKANO was injured as a direct and proximate result of Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions, entitling Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO to receive compensatory (survival) and nominal damages against Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE.

WHEREFORE, Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO prays for relief as hereunder appears.

**THIRD CLAIM**

**§ 504 of the Rehabilitation Act**

**(29 U.S.C. § 701, *et seq*.)**

170.    Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO (pursuant to California Code of Civil Procedure § 377.30) asserts this Claim against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC.

171.    The allegations of the preceding paragraphs 1 to 163 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

172.    Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC. receive federal financial assistance. JONATHAN KUKAR-TEKANO had an impairment that substantially limited one or more major life activities and had a record of such an impairment.

173.    *Vicarious Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 2 to 20 failed reasonably to accommodate JONATHAN KUKAR-TEKANO's disability, where they could have provided a reasonable accommodation, including by performing a comprehensive mental health screening; performing a comprehensive classification and housing assignment; providing medical/mental health treatment; performing a comprehensive suicide risk assessment; timely and adequate monitoring and observation; obtaining informed opinions from medical/mental health professionals; and/or recommending urgent referral to an outside provider, with deliberate indifference or reckless disregard to rights protected by the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.

174.    *Municipal / Vicarious Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintained policies or customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, with deliberate indifference or reckless disregard to rights protected by the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.

175.    Plaintiff JONATHAN KUKAR-TEKANO was injured as a direct and proximate result of Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions, entitling Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO to receive compensatory (survival) and nominal damages against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, and WELLPATH MANAGEMENT, INC.

WHEREFORE, Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO prays for relief as hereunder appears.

## FOURTH CLAIM

### Unwarranted Interference with Familial Association

### (U.S. Const. Amend. XIV; 42 U.S.C. § 1983)

176.    Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO assert this Claim against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

177.    The allegations of the preceding paragraphs 1 to 157 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

178.    Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO shared a close relationship and special bond with JONATHAN KUKAR-TEKANO, which included deep attachments, commitments, and distinctively personal aspects of their lives and was typical of a loving parent-child relationship, prior to his death. Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO frequently visited or spoke with JONATHAN KUKAR-TEKANO.

179.    *Individual / Municipal / Supervisory Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES

1    HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20 caused the unwarranted

2    interference with, and premature termination of, Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA

3    KUKAR, and DARRYL TEKANO's familial association with JONATHAN KUKAR-TEKANO, in the

4    violation of the Fourteenth Amendment to the United States Constitution.

5        180.    Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN

6    PITTELLI, and DOE 1 to 20's actions and inactions were motivated by evil motive or intent, involved

7    reckless or callous indifference to constitutional rights, or were wantonly or oppressively done.

8        181.    Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO

9    were injured as a direct and proximate result of Defendants COUNTY OF EL DORADO, EL DORADO

10    COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP,

11    INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE

12    MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions, entitling them to receive

13    compensatory (wrongful death) and nominal damages against Defendants COUNTY OF EL DORADO,

14    EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC

15    MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES

16    HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20; and punitive damages against

17    Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE

18    1 to 20.

19        WHEREFORE, Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL

20    TEKANO pray for relief as hereunder appears.

21                            **FIFTH CLAIM**

22                **Unwarranted Interference with Familial Association**

23                **(U.S. Const. Amend. I; 42 U.S.C. § 1983)**

24        182.    Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO

25    assert this Claim against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY

26    SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC.,

27    WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER,

28    STEPHEN PITTELLI, and DOE 1 to 20.

183.    The allegations of the preceding paragraphs 1 to 157 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

184.    Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO shared a close relationship and special bond with JONATHAN KUKAR-TEKANO, which included deep attachments, commitments, and distinctively personal aspects of their lives and was typical of a loving parent-child relationship, prior to his death. Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO frequently visited or spoke with JONATHAN KUKAR-TEKANO.

185.    *Individual / Municipal / Supervisory Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20 caused the unwarranted interference with, and premature termination of, Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO's familial association with JONATHAN KUKAR-TEKANO, in the violation of the First Amendment to the United States Constitution.

186.    Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to constitutional rights, or were wantonly or oppressively done.

187.    Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO were injured as a direct and proximate result of Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions, entitling them to receive compensatory (wrongful death) and nominal damages against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20; and punitive damages against Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

1    WHEREFORE, Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL

2  TEKANO pray for relief as hereunder appears.

3                                    **SIXTH CLAIM**

4                          **Failure to Summon Medical Care**

5                              **(Cal. Gov. Code § 845.6)**

6    188.    Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO (pursuant to California Code of

7  Civil Procedure § 377.30) asserts this Claim against Defendants COUNTY OF EL DORADO, EL

8  DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER,

9  STEPHEN PITTELLI, and DOE 1 to 20.

10    189.    The allegations of the preceding paragraphs 1 to 157 are realleged and incorporated, to the

11  extent relevant and as if fully set forth in this Claim.

12    190.    *Individual Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN

13  PITTELLI, and DOE 2 to 20 knew or had reason to know that JONATHAN KUKAR-TEKANO was in

14  need of immediate medical care and failed to take reasonable action to summon such medical care, in

15  violation of California Government Code § 845.6.

16    191.    *Municipal / Supervisory Liability*: Defendants COUNTY OF EL DORADO, EL

17  DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, and DOE 1 maintained policies or

18  customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, in violation of

19  California Government Code § 845.6.

20    192.    *Vicarious Liability*: Defendants COUNTY OF EL DORADO and EL DORADO

21  COUNTY SHERIFF'S OFFICE are vicariously liable, through the principles of *respondeat superior* and

22  pursuant to California Government Code §§ 815.2(a), 845.6, for injuries proximately caused by the acts

23  and omissions of employees acting within the scope of employment, including Defendants JEFF

24  LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and/or DOE 1 to 20.

25    193.    Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN

26  PITTELLI, and DOE 1 to 20's actions and inactions constituted oppression, fraud, and/or malice

27  resulting in great harm.

28    194.    JONATHAN KUKAR-TEKANO was injured as a direct and proximate result of

1  Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF

2  LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH

3  MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to

4  20's actions and inactions, entitling Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO to receive

5  compensatory (survival) and nominal damages against Defendants COUNTY OF EL DORADO, EL

6  DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER,

7  STEPHEN PITTELLI, and DOE 1 to 20; and punitive damages against Defendants JEFF LEIKAUF,

8  JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

9       WHEREFORE, Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO prays for relief as

10  hereunder appears.

11                          **SEVENTH CLAIM**

12                    **California Public Records Act**

13                **(Cal. Gov. Code § 7920.000 *et seq.*)**

14       195.    Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO (pursuant to California Code of

15  Civil Procedure § 377.30), SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL

16  TEKANO assert this Claim against Defendants COUNTY OF EL DORADO and EL DORADO

17  COUNTY SHERIFF'S OFFICE.

18       196.    The allegations of the preceding paragraphs 1 to 145 are realleged and incorporated, to the

19  extent relevant and as if fully set forth in this Claim.

20       197.    Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S

21  OFFICE failed to produce public records, including in a timely and complete manner, in violation of

22  California Government Code § 7920.000 *et seq*.

23       198.    Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE KUKAR-

24  TEKANO, SANDRA KUKAR, and DARRYL TEKANO were injured as a direct and proximate result

25  of Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE's

26  actions and inactions, entitling them to receive declaratory and injunctive relief against Defendants

27  COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE.

28       WHEREFORE, Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE KUKAR-

TEKANO, SANDRA KUKAR, and DARRYL TEKANO pray for relief as hereunder appears.

## EIGHTH CLAIM

### Tom Bane Civil Rights Act

### (Cal. Civ. Code § 52.1)

199.    Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO (pursuant to California Code of Civil Procedure § 377.30), SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO assert this Claim against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

200.    The allegations of the preceding paragraphs 1 to 198 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

Deliberate Indifference

201.    *Individual Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 2 to 20 inadequately screened, classified, assigned, housed, monitored, and/or responded to JONATHAN KUKAR-TEKANO based on an immediate medical need, putting him at substantial risk of suffering serious harm, without taking reasonable available measures to abate that risk, where a reasonable official in the circumstances would have appreciated the high degree of risk involved, with deliberate indifference or reckless disregard to rights protected by the Fourteenth Amendment to the United States Constitution; and Article I, Section 7(a) of the California Constitution.

202.    *Municipal / Supervisory Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintained policies or customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, with deliberate indifference or reckless disregard to rights protected by the Fourteenth Amendment to the United States Constitution; and Article I, Section 7(a) of the California Constitution.

Title II of the Americans with Disabilities Act & § 504 of the Rehabilitation Act

203.    *Vicarious Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN

58

1  PITTELLI, and DOE 2 to 20 failed reasonably to accommodate JONATHAN KUKAR-TEKANO's

2  disability, where they could have provided a reasonable accommodation, including by performing a

3  comprehensive mental health screening; performing a comprehensive classification and housing

4  assignment; providing medical/mental health treatment; performing a comprehensive suicide risk

5  assessment; timely and adequate monitoring and observation; obtaining informed opinions from

6  medical/mental health professionals; and/or recommending urgent referral to an outside provider, with

7  deliberate indifference or reckless disregard to rights protected by the Americans with Disabilities Act,

8  42 U.S.C. § 12101, *et seq*.; and the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*

9      204.  *Municipal / Vicarious Liability*: Defendants COUNTY OF EL DORADO, EL DORADO

10  COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP,

11  INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 maintained policies or

12  customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, with deliberate

13  indifference or reckless disregard to rights protected by the Americans with Disabilities Act, 42 U.S.C. §

14  12101, *et seq*.; and the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*

15              Unwarranted Interference with Familial Association

16      205.  *Individual / Municipal / Supervisory Liability*: Defendants COUNTY OF EL DORADO,

17  EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC

18  MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES

19  HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20 caused the unwarranted

20  interference with, and premature termination of, Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA

21  KUKAR, and DARRYL TEKANO's familial association with JONATHAN KUKAR-TEKANO, with

22  deliberate indifference or reckless disregard to rights protected by the First and Fourteenth Amendments

23  to the United States Constitution; and Article I, Section 7(a) of the California Constitution.

24              Failure to Summon Medical Care

25      206.  *Individual Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN

26  PITTELLI, and DOE 2 to 20 knew or had reason to know that JONATHAN KUKAR-TEKANO was in

27  need of immediate medical care and failed to take reasonable action to summon such medical care, with

28  deliberate indifference or reckless disregard to rights protected by California Government Code § 845.6.

59

207.    *Municipal / Supervisory Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, and DOE 1 maintained policies or customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, with deliberate indifference or reckless disregard to rights protected by California Government Code § 845.6.

California Public Records Act

208.    Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE failed to produce public records, including in a timely and complete manner, with deliberate indifference or reckless disregard to rights protected by California Government Code § 7920.000 *et seq.*

*    *    *

(Allegations Common to All Theories)

209.    *Vicarious Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC. are vicariously liable, through the principles of *respondeat superior* and/or pursuant to California Government Code §§ 815.2(a), 845.6, for injuries proximately caused by the acts and omissions of employees acting within the scope of employment, including Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and/or DOE 1 to 20.

210.    Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

211.    JONATHAN KUKAR-TEKANO and Plaintiffs SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO were injured as a direct and proximate result of Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions, entitling Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO to receive compensatory (survival and wrongful death) and treble damages and civil/statutory penalties against Defendants

60

1  COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF,

2  CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH

3  MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to

4  20; and punitive damages against Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER,

5  STEPHEN PITTELLI, and DOE 1 to 20.

6       WHEREFORE, Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE KUKAR-

7  TEKANO, SANDRA KUKAR, and DARRYL TEKANO pray for relief as hereunder appears.

8  **NINTH CLAIM**

9  **Intentional Infliction of Emotional Distress**

10       212.    Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO (pursuant to California Code of

11  Civil Procedure § 377.30) asserts this Claim against Defendants CALIFORNIA FORENSIC MEDICAL

12  GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE

13  MOSHER, STEPHEN PITTELLI, and DOE 2 to 20.

14       213.    The allegations of the preceding paragraphs 1 to 211 are realleged and incorporated, to the

15  extent relevant and as if fully set forth in this Claim.

16       214.    *Individual Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN

17  PITTELLI, and DOE 2 to 20 engaged in outrageous conduct, including by inadequately screening,

18  classifying, assigning, housing, monitoring, and/or responding to JONATHAN KUKAR-TEKANO

19  based on an immediate medical need, in violation of the United States and California Constitutions,

20  federal and state laws, regulations, policies, standards, general orders, procedures, training, national and

21  local standards, with intent or reckless disregard of the probability that JONATHAN KUKAR-TEKANO

22  would suffer emotional distress and he did suffer severe emotional distress.

23       215.    *Vicarious Liability*: Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC.,

24  WELLPATH LLC, and WELLPATH MANAGEMENT, INC. are vicariously liable, through the

25  principles of *respondeat superior*, for injuries proximately caused by the acts and omissions of

26  employees acting within the scope of employment, including Defendants JULES HOGANSON, KATE

27  MOSHER, STEPHEN PITTELLI, and DOE 11 to 20.

28       216.    Defendants JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 2

61

1  to 20's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

2  217.    JONATHAN KUKAR-TEKANO was injured as a direct and proximate result of

3  Defendants JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 2 to 20's actions

4  and inactions, entitling Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO to receive compensatory

5  (survival) and punitive damages against Defendants JULES HOGANSON, KATE MOSHER, STEPHEN

6  PITTELLI, and DOE 2 to 20.

7  WHEREFORE, Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO prays for relief as

8  hereunder appears.

9  **TENTH CLAIM**

10  **Negligence**

11  218.    Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO (pursuant to California Code of

12  Civil Procedure § 377.30) asserts this Claim against Defendants COUNTY OF EL DORADO, EL

13  DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL

14  GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE

15  MOSHER, STEPHEN PITTELLI, and DOE 1 to 20; and punitive damages against Defendants JEFF

16  LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

17  219.    The allegations of the preceding paragraphs 1 to 217 are realleged and incorporated, to the

18  extent relevant and as if fully set forth in this Claim.

19  220.    *Individual Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN

20  PITTELLI, and DOE 2 to 20 owed JONATHAN KUKAR-TEKANO a duty of care and breached that

21  duty, including by inadequately screening, classifying, assigning, housing, monitoring, and/or responding

22  to JONATHAN KUKAR-TEKANO based on an immediate medical need, in violation of the United

23  States and California Constitutions, federal and state laws, regulations, policies, standards, general

24  orders, procedures, training, national and local standards, and/or California Civil Code § 1714(a).

25  221.    *Supervisory Liability*: Defendants JEFF LEIKAUF and DOE 1 owed JONATHAN

26  KUKAR-TEKANO a duty of care, including through Defendants JEFF LEIKAUF and DOE 1's own

27  conduct in creating or increasing an unreasonable risk of harm to JONATHAN KUKAR-TEKANO;

28  through Defendants JEFF LEIKAUF and DOE 1's special relationships (employer-employee) with

62

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Estate of Kukar-Tekano v. County of El Dorado*, United States District Court, Eastern District of California, Case No. _____

Defendants JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 2 to 20; and/or through Defendants JEFF LEIKAUF and DOE 1's special relationships (public protection and/or jailer-prisoner) with, and affirmative duty to protect, JONATHAN KUKAR-TEKANO, and breached that duty including by maintaining policies or customs of action and inaction which resulted in harm to JONATHAN KUKAR-TEKANO in violation of the United States and California Constitutions, federal and state laws, regulations, policies, standards, general orders, procedures, training, national and local standards, and/or California Civil Code § 1714(a).

222.    *Municipal Liability*: Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE maintained policies or customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, in violation of California Government Code § 845.6 and/or California Code of Regulations title 15 §§ 1027, 1027.5.

223.    *Vicarious Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC. are vicariously liable, through the principles of *respondeat superior* and/or pursuant to California Government Code §§ 815.2(a), 845.6, for injuries proximately caused by the acts and omissions of employees acting within the scope of employment, including Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and/or DOE 1 to 20.

224.    Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

225.    JONATHAN KUKAR-TEKANO was injured as a direct and proximate result of Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20; and punitive damages against Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions, entitling Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO to receive compensatory (survival) damages against Defendants

1  COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF,

2  CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH

3  MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to

4  20; and punitive damages against Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER,

5  STEPHEN PITTELLI, and DOE 1 to 20; and punitive damages against Defendants JEFF LEIKAUF,

6  JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

7         WHEREFORE, Plaintiff ESTATE OF JONATHAN KUKAR-TEKANO prays for relief as

8  hereunder appears.

## ELEVENTH CLAIM

### Wrongful Death

### (Cal. Code Civ. Proc. § 377.60)

12     226.    Plaintiff SHYANNE KUKAR-TEKANO asserts this Claim against Defendants COUNTY

13  OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA

14  FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC.,

15  JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

16     227.    The allegations of the preceding paragraphs 1 to 225 are realleged and incorporated, to the

17  extent relevant and as if fully set forth in this Claim.

18     228.    JONATHAN KUKAR-TEKANO and Plaintiff SHYANNE KUKAR-TEKANO shared a

19  natural and loving parent-child relationship. JONATHAN KUKAR-TEKANO is the biological parent of

20  Plaintiff SHYANNE KUKAR-TEKANO. JONATHAN KUKAR-TEKANO held out Plaintiff

21  SHYANNE KUKAR-TEKANO as his own. Plaintiff SHYANNE KUKAR-TEKANO is JONATHAN

22  KUKAR-TEKANO's heir and successor-in-interest. JONATHAN KUKAR-TEKANO frequently visited

23  or spoke with Plaintiff SHYANNE KUKAR-TEKANO.

24     229.    *Individual Liability*: Defendants JULES HOGANSON, KATE MOSHER, STEPHEN

25  PITTELLI, and DOE 2 to 20 caused JONATHAN KUKAR-TEKANO's death by wrongful act and

26  neglect, including by inadequately screening, classifying, assigning, housing, monitoring, and/or

27  responding to JONATHAN KUKAR-TEKANO based on an immediate medical need, in violation of the

28  United States and California Constitutions, federal and state laws, regulations, policies, standards,

general orders, procedures, training, national and local standards, and/or California Civil Code § 1714(a).

230. *Municipal / Supervisory Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., and DOE 1 caused JONATHAN KUKAR-TEKANO's death by wrongful act and neglect, including by maintained policies or customs of action and inaction resulting in harm to JONATHAN KUKAR-TEKANO, in violation of the United States and California Constitutions, federal and state laws, regulations, policies, standards, general orders, procedures, training, national and local standards, and/or California Civil Code § 1714(a).

231. *Vicarious Liability*: Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, and CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC. are vicariously liable, through the principles of *respondeat superior* and/or pursuant to California Government Code §§ 815.2(a), 845.6, for injuries proximately caused by the acts and omissions of employees acting within the scope of employment, including Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and/or DOE 1 to 20.

232. Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

233. JONATHAN KUKAR-TEKANO died as a direct and proximate result of Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20's actions and inactions, entitling Plaintiff SHYANNE KUKAR-TEKANO to receive compensatory (wrongful death) damages against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20; and punitive damages against Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20.

WHEREFORE, Plaintiff SHYANNE KUKAR-TEKANO prays for relief as hereunder appears.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO seek Judgment as follows:

1.    For an award of compensatory, general, special, and nominal damages (including survival and wrongful death damages under federal and state law) against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20, according to proof at trial;

2.    For an award of exemplary/punitive damages against Defendants JEFF LEIKAUF, JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20, in an amount sufficient to deter and to make an example of them, because their actions and/or inactions, as alleged, were motivated by evil motive or intent, involved reckless or callous indifference to constitutionally and statutorily protected rights, or were wantonly or oppressively done; and/or constituted oppression, fraud, or malice resulting in great harm;

3.    For funeral and/or burial expenses;

4.    For an award of actual damages, treble damages, punitive damages, civil penalties, and any other available relief against Defendants COUNTY OF EL DORADO, EL DORADO COUNTY SHERIFF'S OFFICE, JEFF LEIKAUF, CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH LLC, WELLPATH MANAGEMENT, INC., JULES HOGANSON, KATE MOSHER, STEPHEN PITTELLI, and DOE 1 to 20, pursuant to California Civil Code §§ 52, 52.1, and any other statute as may be applicable (except that no punitive damages are sought against Defendants COUNTY OF EL DORADO and EL DORADO COUNTY SHERIFF'S OFFICE, pursuant to California Civil Code § 818);

5.    For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794, 42 U.S.C. § 12205, California Government Code § 7923.115, California Civil Code § 52.1, California Code of Civil Procedure § 1021.5, and any other statute as may be applicable;

6.      For interest; and

7.      For an award of any other further relief, as the Court deems fair, just, and equitable.

Dated: July 1, 2025                          Respectfully Submitted,

By: _____
Mark E. Merin
Paul H. Masuhara
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone: (916) 443-6911
Facsimile: (916) 447-8336

Attorneys for Plaintiffs
ESTATE OF JONATHAN KUKAR-TEKANO,
SHYANNE KUKAR-TEKANO,
SANDRA KUKAR, and DARRYL TEKANO

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Estate of Kukar-Tekano v. County of El Dorado*, United States District Court, Eastern District of California, Case No. _____

## JURY TRIAL DEMAND

A JURY TRIAL IS DEMANDED on behalf of Plaintiffs ESTATE OF JONATHAN KUKAR-TEKANO, SHYANNE KUKAR-TEKANO, SANDRA KUKAR, and DARRYL TEKANO.

Dated: July 1, 2025                                    Respectfully Submitted,

By: _____
    Mark E. Merin
    Paul H. Masuhara
    LAW OFFICE OF MARK E. MERIN
    1010 F Street, Suite 300
    Sacramento, California 95814
    Telephone: (916) 443-6911
    Facsimile: (916) 447-8336

    Attorneys for Plaintiffs
    ESTATE OF JONATHAN KUKAR-TEKANO,
    SHYANNE KUKAR-TEKANO,
    SANDRA KUKAR, and DARRYL TEKANO

COMPLAINT; DEMAND FOR JURY TRIAL
*Estate of Kukar-Tekano v. County of El Dorado*, United States District Court, Eastern District of California, Case No. _____